## McGinley v. Milk & Ice Cream Salesmen, Drivers & Dairy Employees Local Union No. 205 et al., Appellants.

48

Argued October 2, 1944. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Hughes, JJ.

*S. Harold Grossman* and *H. S. Thatcher,* with them *Joseph A. Padway, James A. Glenn,* and *Harry Savage,* for appellants.

*W. J. Jacob,* for appellees.

Opinion by Mr. Justice Drew, December 8, 1944:

These five suits in equity, involving the same question, were tried together and adjudged at the same time. In all five the Chancellor, affirmed by the court en banc, found for plaintiffs. Defendant took separate appeals.

Plaintiffs were all members in good standing of defendant Union, Milk and Ice Cream Salesmen, Drivers and Dairy Employees Local No. 205, and Joint Council No. 40, of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, hereinafter called the Union. Local No. 205 is an unincorporated association, organized by the International in the City of Pittsburgh, Allegheny County, Pennsylvania. This Local Union holds exclusive contracts with most of the milk and ice cream producers in that area.

The President of Local 205 on or about January 30, 1939, sent out return postal cards to the members re-

questing them to indicate thereon their choice for the office of steward in the particular plant in which they were employed and to return the cards to him. The appointment of such officers was within the sole discretion of the President. The cards were only advisory and could be used or ignored as he saw fit. Because many of the returned cards were filled out in plaintiff's handwriting, the President called them to his office and demanded an explanation. Plaintiffs explained that they had filled out numerous cards upon request of other members. On February 14, 1939, plaintiffs received a letter from the Secretary-Treasurer of the Union, informing them that the President had filed charges against them for violations of Section 91 * of the Union's Constitution, and advising them that they could appear before the Executive Board on February 28, 1939, if they wished to defend themselves. They appeared at this meeting and were then charged with forging names on some of the cards. This

---

* "Sec. 91. (1) Any member who wrongfully takes or retains any money, books, papers or any other property belonging to the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, any Joint Council or Local Union; or (2) who mutilates, erases, destroys or in any way injures any books, bills, receipts, vouchers, or other property of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, any Joint Council or Local Union; or (3) by word, deed or example wilfully injures or retards the growth or prosperity of the International Brotherhood, any Joint Council or Local Union; or (4) who does not use his best efforts to promote all duly accredited union labels and advance the cause of trades unionism, or who does not conduct himself, as far as lies within his power, with credit to the movement; or (5) knowingly gives or attempts to give directly or indirectly, any information to any employer on the unfair list or whose men are on strike or locked out, or are trying to secure an agreement or any improvement in their working conditions, or who are trying to prevent an increase in hours of labor or a decrease in wages, for the purpose of assisting such employer, or for any gain or promise of gain; or (6) knowingly goes to work or remains in the employment of any person, firm or corporation on the unfair list without permission from the International Brotherhood, the Joint Council, or his Local Union, may, upon conviction, be punished by reprimand, fine, suspension or expulsion."

charge was made by the President, who sat as a member of the Executive Board. Not a single witness appeared against plaintiffs. They were found guilty on the mere charge of the President, which was not supported by any evidence. They were fined individually; such fines ranging from $250 to $2,500. Plaintiffs then filed bills in equity, praying that the Union be restrained from enforcing the fines or expelling them. At a preliminary hearing before the court below, it was suggested that plaintiff first exhaust their remedies within the Union, i.e. institute proceedings before the Union's Joint Council. It was then agreed that the Union would take no action to collect the fines or to enforce expulsion until final disposition of the case. While it was also agreed there that plaintiffs could be represented by counsel at the hearing before the Joint Council, nevertheless, when they appeared with their attorney at these proceedings, the latter was denied admittance. Plaintiffs were there charged generally with the violation of Section 91 of the Union's Constitution, and specifically with forgery, theft of some of the cards, and the printing or having had printed spurious cards, and returning them to the President in an effort to influence his choice. Here, again, the charges were made by the President and he had only his own assertion and the cards to support him. No witnesses appeared against plaintiffs. They were given an opportunty to prove their innocence and to that end they offered the same explanation they had given previously at the hearing before the Executive Board. They were found guilty by the Joint Council and fined $1,000 each, in lieu of the former fines levied by the Executive Board. Plaintiffs then filed amended bills of complaint, praying that defendant Union be restrained from enforcing the fines levied or expelling them from membership.

The learned Chancellor after hearing the testimony, found that these cards, were sent out on the President's own initiative and that they had no binding effect upon him or the Union; that the cards were not papers or

other property of the Union within the meaning of Section 91 of the Union's Constitution; that the filling in by plaintiffs of cards other than those addressed to them was not in itself a punishable offense, especially since they were requested to do so by the members to whom they were addressed; that at the trials before the Executive Board and Joint Council, the proceedings were predicated upon plaintiffs' guilt, they being called upon to prove their innocence, rather than being given the presumption of such innocence until proved guilty; and that the trials were, therefore, unfair. Also, the Chancellor found that the size of the fines assessed against plaintiffs was such that it would be impossible for them to pay; that the result of non-payment would be that they would lose their jobs; that since there was no specific fines set up for any offense, plaintiffs could not have impliedly agreed to such unfair and confiscatory assessments by submitting themselves to trial before the Union tribunals; and that since the Union did not conduct the trials in a fair, just and impartial manner, its findings were void and of no effect. The decrees of the Chancellor, granting plaintiffs' prayers and restraining the Union from enforcing the fines or expelling plaintiffs, were affirmed by the court en banc and made final.

Defendant contends that the court has no jurisdiction to overrule the Joint Council, and that members tried by it have no appeal. While we agree that where the by-laws of an unincorporated association provide a proper tribunal and that tribunal acts within the confines of those by-laws, the members are bound by its decisions (*Spayd v. Ringing Rock Lodge*, 74 Pa. Superior Ct. 139), still it is true that where no evidence exists to support the charges or the trial is irregular, a finding of guilt by such a body must be set aside (*Bogadek v. Butkovic*, 336 Pa. 284, 9 A. 2d 388), and, after a careful reading of the record, we are obliged to agree with the learned Chancellor that here there was no offense committed which could be construed as a violation of Section 91 of

the Union's Constitution. Therefore, plaintiffs should not have been found guilty, for the only formal charge that was lodged against them was violation of this section. Since there was no such violation, the collateral and informal charges of theft, forgery and printing of spurious cards become immaterial. As the evidence does not support these allegations, it matters not how the Union tribunals conducted their trials. Plaintiffs were tried for an offense which was clearly outside the Union's Constitution and By-laws. Therefore, such trials and subsequent decisions must be considered nullities. The action taken by the Union, with the obvious purpose of removing these men from membership, which would have the effect of preventing them from earning a livelihood in their chosen trade, was a flagrant violation of their rights under the law of their Union, and was contrary to law and justice.

Since the findings of the Chancellor, affirmed by the court en banc, are fully supported by the testimony (the truth being there is no valid, relevant and material testimony to the contrary), we cannot disturb such findings. We said, in *Quinn Coal Co. v. Scranton A. C. Co.*, 350 Pa. 21, 22, 38 A. 2d 77: "The testimony shows however that the findings of the Chancellor, affirmed by the court en banc, . . . are supported by evidence that is real and substantial. Even if we have a doubt of the correctness of that conclusion it would not be enough to justify our setting aside those findings, which involve the credibility of witnesses and the weight to be given their testimony, and have the effect of a verdict of a jury. Nothing but clear error would warrant such action on our part, and it does not appear here: *Cruzan v. Cruzan*, 243 Pa. 165, 89 A. 876; *Heffernan v. Heffernan*, 344 Pa. 137, 23 A. 2d 424."

Decrees affirmed. Costs to be paid by appellants.

DISSENTING OPINION BY MR. JUSTICE HORACE STERN:

I find myself in serious disagreement with the views of the Court as expressed in the majority opinion.

We must not overlook the importance of the project by which the President of the Local sought to obtain an expression from its members of their preferences for the position of steward and contract committeeman at each of the plants in which the members were employed. It is true that his poll was intended to be advisory only, but presumably it was not merely a gesture on his part and he did in fact make practically all appointments in accord with the votes received. It was stated on the postals that his desire was to institute a democratic method for obtaining majority rule and to bring about harmony and unity within the organization. The offices of steward and contract committeeman are of considerable importance in this Local of approximately 2700 members. The steward at each plant handles all grievances and complaints, while the contract committeeman gathers and submits recommendations for the contracts to be negotiated with the employers. It is obvious, therefore, that the selection of the most competent persons to fill such offices is vital to the welfare of the Union with respect both to its own membership and its relations with the plant owners. The fact that the poll was not official or actually provided for by the by-laws of the Local does not, to my mind, lessen the gravity of the offense of which the five plaintiffs were convicted.

The legal principle involved is beyond dispute. Where the proceedings within the organization have been regular, fair, and free from fraud, and the party whose rights are involved has been given an opportunity to appear and be heard, the courts will not inquire into the merits of the case nor review the action of the association: *Bogadek v. Butkovic*, 336 Pa. 284, 9 A. 2d 388.

I find nothing in the record which justifies the conclusion that there was anything in the proceedings within the Union that was not "regular, fair and free from fraud," or which indicates that plaintiffs were not given every opportunty to appear and be heard before the tribunals provided by the Union's constitution and by-

laws. The first trial was before the Executive Board of the Local, which consists of 7 persons. This was followed by an appeal to the Joint Council, which is made up of representatives from 18 of the Locals and consists of 144 persons. As the Joint Council heard the case de novo the initial proceedings before the Executive Board of the Local were thereby completely superseded, but even in the hearing before the Executive Board there was, in my opinion, no irregularity which affords plaintiffs the slightest basis for complaint.

At the hearing before the Joint Council on appeal *over 100 persons* actually sat as judges, *and their vote was unanimous.* The President of the Local, who originally made the charges against plaintiffs, did not vote in the Joint Council on the question of their guilt or innocence, although he had the right under the by-laws to do so.

It is important at the outset, of course, to understand the offense with which plaintiffs were charged. It appears that the President sent to each of the 2700 members of the Local a postal requesting that they express their respective preferences for appointments to the two offices in question, a return postal being attached upon which the vote was to be expressed. A number of the postals were returned for want of proper addresses; the President, in such instances, mailed out new postals addressed to those members in care of the particular establishment at which they were employed. These new postals, or some of them, lying on the desk of the superintendent at the Rieck-McJunkin plant awaiting distribution, were stolen, and the addressees never received them, but the return postals attached to them were nevertheless mailed back to the President with the name of plaintiff Bence inserted as the preferred nominee for the office of steward. Furthermore a large number of the postal cards mailed in were spurious, having been clandestinely and fraudulently printed in imitation of the genuine ones; these bogus cards were filled out in the names of one or

the others of the remaining plaintiffs for the office either of steward or contract committeeman. In short, there was an attempted falsification of the vote, partly by casting ballots that had been intended for other persons, and partly by manufacturing and voting illegitimate and wholly unauthorized ballots.

Both before the Executive Board of the Local and before the Joint Council plaintiffs were informed of the charges against them and were given, as they themselves admit, every possible opportunity to prepare a defense, to produce witnesses of their own and to question any of the testimony or challenge any of the accusations. It is true they were not allowed to present their case through a lawyer, but never has it been held that a member of a private organization has any legal right to be heard by counsel or by any other person not a member of the organization. It is said in the majority opinion that "Not a single witness appeared against plaintiffs. They were found guilty on the mere charge of the President, which was not supported by any evidence . . . Here, again, (before the Joint Council) the charges were made by the President and he had only his own assertion and the cards to support him. No witnesses appeared against plaintiffs." In the first place, every one of the plaintiffs except McMillan *admitted* that he had filled out at least *some* of the cards that had been stolen or illegally printed; the only question in dispute was the number of such cards. Two of the plaintiffs made such admissions in writing. In the second place, the cards themselves were presented in evidence so that comparisons could be made both with admitted signatures on other documents which were also placed in evidence and with such of the returned cards as were admittedly written by plaintiffs. In the third place, all the evidence necessary for conviction was obtained through the cross-examination of plaintiffs themselves, whose testimony, as I read it, was so evasive and so self-incriminating that I believe any jury sitting in a criminal court room would have been

well justified in finding them guilty. When it is said in the majority opinion that "Plaintiffs explained that they had filled out numerous cards upon request of other members," the testimony discloses that the "other members" referred to were their fellow plaintiffs and not the individual addressees to whom any of the original postal cards had been sent; not a one of the addressees was presented as a witness by any of the plaintiffs. The court below did not find as a fact, and from the testimony could not have found, that the individual addressees had made such a request or given any such authority. On the contrary, the testimony of plaintiffs clearly indicated that some of them, having a number of these cards, asked the other plaintiffs to sign a few of them for no other reason than thereby to avoid all of these illegitimate cards being returned in the same handwriting. There was testimony to the effect that the stolen cards were all mailed at one and the same time and cancelled by the same machine in the Post Office and this was practically true of the bogus cards as well. It does not seem to me that any one can read the record of the testimony taken before the Joint Council without coming to the conclusion that at least four of these plaintiffs had entered into a scheme to "stuff the ballot box" in order to swing the "election" for their own candidacies.

It was said by the learned Chancellor that the proceedings before the Executive Board and the Joint Council were predicated upon plaintiffs' guilt, they being called upon to prove their innocence rather than being given the presumption of such innocence until proved guilty. There is not, in my opinion, the slightest justification for such a conclusion. It is true that most of the proceedings consisted of a cross-examination of the plaintiffs, but they appeared voluntarily and submitted themselves to such examination, and certainly the fact that their conviction was based in large part upon the evidence which they themselves furnished does not mean that they had been denied the presumption of innocence.

Their own testimony was legally sufficient for conviction: *Bogadek v. Butkovic,* 336 Pa. 284, 287, 9 A. 2d 388, 390.

A basic error in the court below, which to some extent seems to me to be perpetuated in the majority opinion, is that the learned Chancellor heard the entire case de novo and received evidence bearing on the question of the actual guilt or innocence of the plaintiffs. Hundreds of pages of testimony were thus taken which were wholly irrelevant. The only proper inquiry was as to the regularity of the proceedings before the tribunals provided by the Union, for the court had no right to concern itself with the merits of the controversy but only with the question whether the organization had properly administered its own rules. If there was nothing basically unfair in those proceedings and there was any testimony whatever to support the result reached, then, according to the law of this commonwealth from which there has never hitherto been any departure, the findings of the Union's own tribunals cannot be set aside by the court.

We come now to the issue on which the present decision of the court is principally based, namely, whether the charges against plaintiffs are within the scope of section 91 of the constitution and by-laws of the Union. The majority opinion states that "here there was no offense committed which could be construed as a violation of section 91 of the Union's constitution. . . . Plaintiffs were tried for an offense which was clearly outside the Union's constitution and by-laws." From that conclusion I must emphatically dissent. Section 91 enumerates as punishable offenses the wrongful taking of any books, papers or other property belonging to the Union or any of the Locals. The postal cards in this case did belong to the Local; they were paid for with its money and were used for its benefit and not for any purpose of the President in his individual capacity. A second offense set forth in the section is the mutilation or other injury to any books, bills, receipts, vouchers or other property of

the Union or any Local. Plaintiffs did "mutilate" and "injure"—within the general intendment of those terms—the postal cards which they subverted from their proper purpose and on which they inserted names without proper authority. The next offense enumerated in section 91 is that of wilfully injuring or retarding, by word, deed or example, the growth or prosperity of the Union or any Local. Certainly what plaintiffs did in this case was a wilful act well calculated to injure and retard the growth and prosperity of the Union by bringing its methods and activities into disrepute and subjecting them to public censure. Finally, there is included the offense of a member failing to conduct himself, as far as lies within his power, with credit to the movement. No one would say that these plaintiffs conducted themselves with credit to the movement. Plaintiffs were specifically charged with having committed each and every one of these enumerated offenses. The by-laws of a private organization can scarcely be expected to enumerate in detail every act for which a member is subject to fine or expulsion and in effect incorporate in its by-laws the entire criminal code of the commonwealth. If, for example, a social club were to have a by-law which provided that a member guilty of conduct "unbecoming a gentleman" should be expelled, can it be doubted that such a by-law was sufficiently specific to be enforced, or that it would be for the legally constituted tribunals of the organization itself to determine, subject only to reasonableness, whether a given act constituted such unbecoming conduct? It seems to me quite shocking to declare that this Local and this Union were powerless to punish members who, gaining possession of stolen and illegally printed ballots, fraudulently voted them, with the potential danger of causing incalculable injury to the internal organization of the Local and gravely imperilling its relations with the various plants where its members were employed.

A suggestion is made in the majority opinion that we cannot disturb findings of the Chancellor. This would

be true were we dealing with findings of fact, but we are here concerned with inferences and conclusions from facts substantially none of which is in dispute. A complete record of the proceedings before the Joint Council was introduced in the testimony as an exhibit, and it is certainly within our province to determine whether those proceedings indicate any unfairness, irregularity or fraud.

In one respect I am in accord with the conclusions of the court below as now affirmed by this court; I refer to the amount of the fines imposed, which in my opinion were excessive and unreasonable. Not only does the law provide that the by-laws of an association must be reasonable (*Lynn v. Freemansburg Building & Loan Association,* 117 Pa. 1, 11 A. 537; *Spayd v. Ringing Rock Lodge* 270 Pa. 67, 113 A. 70) but, as a corollary to this, by-laws must be interpreted so as not to permit of their enforcement in an unreasonable manner. These plaintiffs were men of family and their average earnings were about $32. a week. A fine of $1000. would therefore be equivalent to a taking of their wages for the period of more than half a year, and it was ordered that the fines be paid within seven days. It is scarcely likely that in the adoption of the by-laws fines of any such magnitude were in contemplation. True, the penalty imposed might have been that of expulsion, but, since it was decided that a fine and not expulsion was the proper punishment under the circumstances, the fines had to be reasonable and not imposed for the real but concealed purpose of forcing an expulsion which, according to the by-laws, would automatically follow upon failure to make payment.

I would reverse the decree of the court below and order the dismissal of the bill conditionally upon the Union's reducing each of the fines to not more than $100.

Mr. Chief Justice MAXEY and Mr. Justice HUGHES concurred in this dissent.