Falsetti, Appellant, *v.* Local Union No. 2026, United Mine Workers of America.

146

Argued October 6, 1959.   Before JONES, C. J., BELL, JONES, COHEN, BOK and MCBRIDE, JJ.

*Thomas N. Bucar,* with him *Eddy & Bucar,* for appellant.

*Harold R. Schmidt,* with him *Rose, Houston, Cooper and Schmidt,* for appellee.

*Joseph M. Gaydos,* for appellee.

OPINION BY MR. JUSTICE COHEN, June 3, 1960:

This is an appeal from the order of the Court of Common Pleas of Allegheny County dismissing appellant's bill in equity on preliminary objections. Appellant's amended complaint alleged that he was a dues-paying member in good standing in appellee Local No. 2026, United Mine Workers of America (Union); that he was employed by appellee Pittsburgh Consolidation Coal Company (Company), with seniority from 1939; that on January 8, 1954, in violation of appellant's seniority rights under the collective bargaining agreement between Union and Company, he was laid off by the Company while at least one, and possibly more, employees with less seniority than he were retained; that appellee Company continues to employ such employee or employees and has rehired others with less seniority than appellant; that appellant's loss of seniority rights came about as a result of an unlawful conspiracy between appellee Company and the named individual appellees (Union officials) under the pretext that appellant was no longer able to fulfill his job obligations; that after appellant filed the original complaint in this action he was expelled from the Union; that he has demanded to be restored to Union membership, but appellee Union has refused, and that all remedies under the Union constitution and collective bargaining agreement between the Union and the Company have been exhausted and further resort thereto would be futile. In his prayer for relief, appellant asks that the Union be compelled to restore appellant's membership; that the appellee Company be compelled to reinstate appellant in his employment with the same job classification he had before the alleged discharge; that damages be awarded appellant for loss of wages;

and that such other and further relief that may be just and equitable be allowed.

Separate preliminary objections to the amended bill of complaint were filed by appellee Company and by the appellee Union officials John Popp, Albert Cole, William Park, Harry Rossi, John T. Busarello, and Marion Pellegrini. By their preliminary objections, appellees contended in substance (1) that the lower court had no subject-matter jurisdiction because (a) the appellee Company, being engaged in interstate commerce, is subject to the provisions of the Labor Management Relations Act of 1947, 29 U.S.C. §141 et seq., and that under the doctrine of federal pre-emption, exclusive jurisdiction in this case is in the National Labor Relations Board or in the Federal courts, and (b) that the contract with the Union and the Union constitution provide adequate grievance procedures which were properly followed and concluded unfavorably to plaintiff, (2) that plaintiff's claim is barred by laches; (3) that necessary and indispensable parties were not joined; (4) that there was a misjoinder of causes of action and that the amended complaint is multifarious.

After studying the pleadings and the briefs of counsel, the lower court came to the conclusion that the amended bill of complaint had to be dismissed for misjoinder of causes of action and for multifariousness, stating that it was also apparent from the pleadings that appellant had failed to exhaust his internal remedies, and thus deeming it unnecessary to discuss the other points raised by appellees in their preliminary objections.

Appellant has attempted to join in one amended complaint two separate and distinct causes of action against different defendants. In his initial complaint, appellant asserted against the Company and the indi-

vidual named officials of the Union an equitable claim based on an alleged wrongful discharge from his employment relationship. Appellant therein sought reinstatement in his job with restoration of his seniority rights and damages. Subsequent thereto, appellant was expelled from the Union. He thereupon amended his original bill, joined *the Union* as defendant, and asserted a new equitable claim based on an alleged wrongful severance of his Union-membership relationship, a claim entirely unrelated in theory to the claim originally asserted. It is the joinder of these separate causes of action that is herein challenged.

A joinder of two or more causes of action cognizable in equity against two or more defendants is permissible under Rule 1508, Pa. R. C. P., provided, however, that the causes of action arise from the same transaction, occurrence, or series of transactions or occurrences, and a common question of law or fact affecting the rights or liabilities of all the parties exists. Rules 1508, 2229(a), (b), Pa. R. C. P. See also Goodrich-Amram §1508-2; 10 Anderson Pa. Civ. Pract. 180-181. The bill now before us does not meet these requirements. In his complaint appellant made no allegation that would connect appellee Union with the alleged discharge in disregard of appellant's seniority rights. Nor was there any allegation in the complaint that appellee Company was in any way responsible for appellant's alleged wrongful expulsion from the Union. Appellant's theory in his amended complaint against the Union is obviously that the reason he was wrongfully expelled was because he had filed the original complaint in this action. This indirect connection with appellant's discharge from employment does not constitute the "same transaction, occurrence, or series of transactions or occurrences" to which the Rules refer. Nor is there a common question of law or fact involved in the two causes of action which would affect

the rights or liabilities of all the parties. A judicial resolution of the issue concerning appellant's discharge and loss of seniority rights would have no bearing whatever on whether the Union had a right to discipline appellant simply for filing suit. The amended complaint thus joins matters entirely distinct, for which appellant claims different rights and in which different parties are concerned. It is therefore objectionable as a misjoinder of causes of action and is properly subject to appellees' preliminary objections. *Hornsby v. Lohmeyer*, 364 Pa. 271, 274, 72 A. 2d 294 (1950); *Kelly v. Thomas*, 234 Pa. 419, 431-32, 83 Atl. 307 (1912); *Elk Brewing Co. v. Neubert*, 213 Pa. 171, 62 Atl. 782 (1906); *Bovaird v. Seyfang*, 200 Pa. 261, 49 Atl. 958 (1901); *Artman v. Giles*, 155 Pa. 409, 26 Atl. 668 (1893); 13 P.L.E. Equity §§94, 96; 8 Stand. Pa. Prac., Chap. 33, §§187-196.

It is in the interest of justice that such unrelated claims must be brought in separate bills. The possibility in the instant case that one of the appellees might be prejudiced by the introduction of evidence upon the other claim is strong indeed. Although the question of multifariousness is generally said to be within the discretion of the trial court,[1] we think it would have been error for the court below not to have sustained the appellees' preliminary objections on this point.

Upon sustaining an objection to such a procedural defect in a complaint, however, the lower court should not dismiss the bill absolutely. Instead, a time period should be established within which the plaintiff must

---

[1] *Zoni v. Importers and Exporters Ins. Co. of New York*, 338 Pa. 165, 168, 12 A. 2d 575 (1940); *Hanna v. Chester Times*, 310 Pa. 583, 166 Atl. 243 (1933); *Komcnarsky, Receiver v. Brode*, 307 Pa. 156, 158, 160 Atl. 713 (1932); *Lafean v. American Caramel Co.*, 271 Pa. 276, 283, 114 Atl. 622 (1921); 8 Stand. Pa. Pract., Chap. 33, §196.

amend on specified terms or conditions upon penalty of the bill's complete dismissal. See *Hanna v. Chester Times*, 310 Pa. 583, 166 Atl. 243 (1933); *MacDougall v. MacDougall*, 397 Pa. 340, 155 A. 2d 358 (1959); 8 Stand. Pa. Pract., Chap. 33, §196. However, in view of the further problems involved which we shall now consider, it will not be necessary to remand with leave to amend.

Since our holding is that the amended complaint alleges two distinct claims, each will be treated separately to determine whether, under our own rules and under the pleadings now before us, the courts of the Commonwealth may exercise jurisdiction over either claim upon a severance. First, we will consider appellant's claim that he was wrongfully expelled from appellee Union. Appellees contend in this regard that appellant has failed to exhaust his internal remedies within the Union and therefore the issue presented is not "ripe" for adjudication by our courts. In rebuttal, appellant offers his amended complaint which alleges: "13. Plaintiff's membership in said defendant Local Union and said International Union was governed by the constitution of the International Union which provides administrative remedies within the union itself for grievances presented by the members thereof. . . .

"20. Said expulsion and cancellation was arbitrary, capricious, unlawful and in contravention of the plaintiff's rights under the Constitution and By-laws of the International Union, United Mine Workers of America.

"21. Plaintiff has since demanded restoration of his membership in defendant Local Union, but said defendant has refused and continues to refuse to reinstate the plaintiff therein. . . .

"25. Plaintiff avers that he has exhausted all the remedies afforded him by the Constitution of the International Union, United Mine Workers of America,

and under the Collective Bargaining Agreement existing between said Union and the defendant Pittsburgh Consolidation Coal Company, and that further resort thereto would be futile and useless in view of the past and continued refusal of the defendants to process the plaintiff's grievance." It is upon these pleadings that appellant would have us sustain the jurisdiction of our courts. Viewing these pleadings in the light most favorable to appellant, we hold that the courts of this Commonwealth may not entertain such a claim for relief.

At this late date in the history of labor-management relations, it is but pointing out the obvious to state that autonomous, self-disciplining labor unions are beneficial to the public. The rule of exhaustion of internal remedies, applicable when a dispute arises between an association and a member thereof, evolved by our courts through the years and applicable to all "voluntary" unincorporated associations,[2] serves to pro-

---

[2] The early recorded cases in the Commonwealth dealt, of course, not with labor organizations but with social and religious associations. *The Black and White Smiths' Society v. Vandyke*, 2 Whart. 308 (1837) ; *Commonwealth ex rel. Bryan v. The Pike Beneficial Society*, 8 W. & S. 247 (1844) ; *Toram v. The Howard Beneficial Association*, 4 Pa. 519 (1846) ; *Franklin Beneficial Association v. Commonwealth*, 10 Pa. 357 (1849) ; *Commonwealth ex rel. Fischer v. The German Society*, 15 Pa. 251 (1850) ; *The Society for the Visitation of the Sick, Etc. v. The Commonwealth ex rel. Meyer*, 52 Pa. 125 (1866) ; *Sperry's Appeal*, 116 Pa. 391, 9 Atl. 478 (1887) ; *Commonwealth ex rel. v. Union League of Phila.*, 135 Pa. 301, 19 Atl. 1030 (1890) ; *Weiss v. The Musical Protective Union*, 189 Pa. 446, 42 Atl. 118 (1899) ; *Myers v. Fritchman*, 6 Pa. Superior Ct. 580 (1898) ; *Sanderson v. Brotherhood of R. R. Trainmen*, 204 Pa. 182, 53 Atl. 767 (1902) ; *Becman v. Supreme Lodge*, 215 Pa. 627, 64 Atl. 792 (1906) ; *Gill v. Ladies Catholic Benevolent Association*, 36 Pa. Superior Ct. 458 (1908) ; *Commonwealth ex rel. v. Heilman*, 241 Pa. 374, 88 Atl. 666 (1913) ; *Carlin v. Ancient Order of Hibernians*, 54 Pa. Superior Ct. 512 (1913) ; *Lazic v. The National Croatian Society of the U. S. A.*, 260 Pa. 205, 103 Atl. 588 (1918) ; *Acri v. Bruscia*, 265 Pa. 384, 108 Atl. 717 (1919).

mote the desired autonomy and to encourage the establishment of fair procedures for maintaining internal

---

Our Court had little difficulty, however, when a case first arose, in applying the rule to labor unions as well. *Maloney v. United Mine Workers of America*, 308 Pa. 251, 162 Atl. 225 (1932). In a lower court case several years prior thereto involving a member's right to have his name on the ballot for an election to union office, Judge (later Chief Justice) MAXEY, sitting as the Court of Common Pleas of Lackawanna County, found it unnecessary to discuss the exhaustion rule because the constitution of the International Union, U. M. W. of A., had no provision for appeal of a decision as to what candidates' names shall appear upon the official ballots. *Williams v. District Executive Board, U. M. W. of A.*, 1 Pa. D. & C. 31, 39 (1921). The cases since *Maloney* have alternated between those that adhered to it strictly and those that relaxed the rule by carving out exceptions because of sympathy for the aggrieved member-plaintiff. For cases that adhere strictly to the rule, see: *Merman v. St. Mary's G. C. Ch.*, 317 Pa. 33, 36, 176 Atl. 450 (1935); *Lodge No. 19 v. Svi Sveti*, 323 Pa. 292, 185 Atl. 650 (1936); *Varzaly v. Yuhasz*, 128 Pa. Superior Ct. 314, 193 Atl. 63 (1937); *West v. Penna. R. R. Co.*, 328 Pa. 156, 194 Atl. 912 (1937); *Raynovic v. Vrlinic*, 334 Pa. 529, 6 A. 2d 288 (1939); *Bogadek v. Butkovic*, 336 Pa. 284, 9 A. 2d 388 (1939); *Raevsky v. Upholsterers' International Union*, 38 Pa. D. & C. 187 (1940); *Trainer v. International Alliance*, 353 Pa. 487, 46 A. 2d 463 (1946); *McCauley v. Lancaster Federation of Musicians*, 52 Lanc. L.R. 95 (1950); *Binkowski v. Highway Truck Drivers*, 8 Pa. D. & C. 2d 254 (1957), affirmed per curiam in 389 Pa. 116, 132 A. 2d 281 (1957); *Durso v. Philadelphia Musical Society*, 11 Pa. D. & C. 2d 463 (1957), affirmed per curiam in 392 Pa. 30, 139 A. 2d 555 (1958); *Grand Lodge, B. of R. & SS. C. v. Girard Lodge*, 384 Pa. 248, 120 A. 2d 523 (1956), cert. den. 351 U. S. 985, 76 S. Ct. 1052, 100 L. Ed. 1498 (1956); *Strano v. Local Union No. 690*, 398 Pa. 97, 156 A. 2d 522 (1959).

For cases that carve out exceptions to the rule, see: *Heasley v. Operative P. & C. F. I. Assn.*, 324 Pa. 257, 188 Atl. 206 (1936); *O'Neill v. United Plumbers*, 348 Pa. 531, 36 A. 2d 325 (1944); *McGinley v. M. & I. C. Salesmen*, 351 Pa. 47, 40 A. 2d 16 (1944); *Blenko v. Schmeltz*, 362 Pa. 365, 67 A. 2d 99 (1949); *Kaminski v. Hoynak*, 373 Pa. 194, 95 A. 2d 548 (1953); *Williams v. Masters, Mates & Pilots*, 384 Pa. 413, 120 A. 2d 896 (1956).

discipline.[3]   Although this court has often relied on the contract rationale that a member, by voluntarily joining an association, has bound himself perpetually to abide by its constitution and by-laws,[4] there are today other and more justifiable policy reasons for applying the exhaustion rule.[5]   If exhaustion of internal remedies were to be treated simply as a contractual condition, we might often be driven to a mechanical application of the rule in instances where such application would be unjust.   And we would be constrained to engraft excep-

---

The rule is firmly entrenched, with varying degrees of emphasis, in almost all jurisdictions. See 31 Am. Jur., Labor, p. 442, sec. 68.

[3] Comment, Exhaustion of Remedies in Private Voluntary Associations, 65 Yale L.J. 369 (1956) ; Hanslowe, Individual Rights in Collective Labor Relations, 45 Corn. L.Q. 25, 55 (1959).

[4] See *The Black and White Smiths' Society v. Vandyke*, supra; *Commonwealth ex rel. Bryan v. The Pike Beneficial Society*, supra; *Toram v. The Howard Beneficial Association*, supra; *The Society for the Visitation of the Sick, Etc. v. The Commonwealth ex rel. Meyer*, supra; *Commonwealth ex rel. v. Union League of Phila.*, supra; *Commonwealth ex rel. v. Heilman*, supra; *O'Neill v. United Plumbers*, supra; *Trainer v. International Alliance*, supra; *Blenko v. Schmeltz*, supra; *Williams v. Masters, Mates & Pilots*, supra.   Cf. *Grand Lodge, B. of R. & SS. C. v. Girard Lodge*, supra.

[5] The contract theory has been severely criticized by the late Professor Chafee in The Internal Affairs of Associations Not for Profit, 43 Harv. L. Rev. 993, 1001-07 (1930).   See also Comment, 65 Yale L.J. 369, 373-75 (1956) ; Note, 86 U. Pa. L. Rev. 885, 887-888 (1938) ; Comment, 45 Yale L. J. 1248, 1263-1266 (1936) ; Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1054-58 (1951).

The theory that there must have been a deprivation of some *property interest* of the member for a right to relief to accrue has also been completely discredited, despite the contrary intimations in *Heasley v. Operative P.&C.F.I. Assn.*, supra. See Chafee, supra at 999-1001; Note, 86 U. Pa. L. Rev. 885, 888-89; Comment, 45 Yale L.J. 1248, 1261-62 (1936) ; Summers, supra at 1051-54, 1056-58.

tions onto the rule which would lead to its eventual emasculation.[6]

We think that the member's relation to the association is the true subject matter of protection when a member seeks relief from an allegedly wrongful expulsion. As the late Professor Chafee stated, "the closest analogy to the position of the member of an association is to be found in the relation between a stockholder and a corporation, or between a partner and the partnership. Such relations are much more than contracts. The law of associations not for profit thus takes its natural place beside the law of business corporations and partnerships. A violation of the relation does not automatically give rise to judicial relief. Judicial consideration must be given to the seriousness of the injury, on the one hand, and, on the other, to the policies which make interference with the particular association undesirable. Sometimes the relation, unlike membership in business corporations and partnerships, may involve only interests of personality, but the courts should still consider whether justice and policy require them to protect it." Chafee, The Internal Affairs of Associations Not For Profit, 43 Harv. L. Rev. 993, 1008 (1930). Applying this rationale, we find the doctrine of exhaustion of internal remedies to be a necessary and proper incentive for achieving true association democracy.

In intra-association disputes, there are three sets of interests to be considered: (1) the interest of the association as such; (2) the interest of the members of the association, and (3) the interest of the courts. There is as well an over-riding *public* interest in promoting well-managed autonomous associations which are able

---

[6] Application of the exhaustion rule does not turn upon the membership status of the party bringing the suit. Applicable to an association member seeking relief within the group, it applies equally to an expelled member who is seeking reinstatement.

to perform their functions effectively and still provide internally for the fair treatment of individual members who must be disciplined. See Chafee, op. cit. supra. The exhaustion rule is beneficial to the association in that by encouraging intra-association resolution of internal disputes, it permits officials in positions of higher authority within the association to carry out a uniform application of the association's policies. The association, in this manner, is able to prevent its "dirty linen" from being washed in public. Moreover, such a rule often saves the association the unnecessary burden and expense of litigation.

The exhaustion rule is beneficial as well to the vast majority of association members. Since very few members are willing to appeal beyond the association level when they are required to exhaust their internal remedies,[7] the majority of members are benefited for the same reasons as the association in having disputes resolved within the association. The rule, when properly applied, will also tend to improve the machinery of the intra-association appellate system and make it a more responsible and efficient means of settling problems of discipline.

We are fully cognizant of the tremendous burden that premature judicial intervention into internal association-member disputes would place on already overcrowded court dockets. The exhaustion rule reduces litigation by forcing disputes through a private system where they may be settled before reaching the courts. This undoubtedly eliminates a needless waste of judicial time and duplication of litigation. The aggrieved member will quite often obtain satisfaction within the association's hierarchy, thereby terminating the dispute before it ripens into a full-blown legal contest. The

---

[7] Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1050 (1951) ; Comment, 65 Yale L.J. 369, 371, n. 14 (1956).

rule, in summary, is extremely valuable in encouraging private adjustment, self-correction, and fair internal procedures.

This is not to say, of course, that the interests of the majority should persuade the courts to ignore the rights and interests of an occasional member who, with good cause, has ignored the association's internal procedure. But in holding that a case falls within one of the narrow exceptions to the exhaustion rule, we must be overly careful not to completely undercut it.[8]  Such exceptions as there are should be narrowly construed in line with the beneficial purposes of the rule itself.  The exceptions are few and should be mentioned at this point.

First and foremost, a person will not be required to take intra-association appeals which cannot in fact yield remedies.  If a remedy exists in theory only, it can well be considered illusory.  Secondly, there is no need for a member to exhaust his internal remedies where the association officials have, by their own actions, precluded the member from having a fair or effective trial or appeal.  See *Heasley v. Operative P. & C. F. I. Assn.,* 324 Pa. 257, 188 Atl. 206 (1936); *Weiss v. The Musical Protective Union,* 189 Pa. 446, 42 Atl. 118 (1899). This includes those situations in which a member is not given due notice, right of hearing or review (See, e.g., Labor Management Reporting and Disclosure Act of 1959, Sec. 101(a)(5)),[9] and those where the associa-

---

[8] For a list of cases in other jurisdictions which indicate the extent to which exceptions have made the rule meaningless, see Comment, 45 Yale L.J. 1248, 1262-63 (1936); Witmer, Civil Liberties And the Trade Union, 50 Yale L.J. 621, 630, n. 35 (1941); Note, 168 A.L.R. 1462 (1947).

For the theories, both good and bad, upon which exceptions to the rule have been based, see Summers, supra at 1086-92.

[9] "(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such

tion's officials are obviously biased or have prejudged the member's case before hearing it. See *Blenko v. Schmeltz,* 362 Pa. 365, 67 A. 2d 99 (1949).[10]

Still another exception to the rule is where to insist that a member exhaust the appellate procedure would be unreasonably burdensome, e.g., if the appellate procedure requires a member to appeal to a national convention which does not convene for several years.[11] See *O'Neill v. United Plumbers,* 348 Pa. 531, 36 A. 2d 325 (1944); *Heasley v. Operative P. & C. F. I. Assn.,* supra. In this regard, for all situations which arise subsequent to the passage of the new "Labor Bill of Rights" contained in the Labor Management Reporting and Disclosure Act of 1959, Sec. 101(a)(4), and to which the Act is applicable, a member of a labor organization may be required to exhaust internal remedies *only if* such hearing procedures are "reasonable" and if they are completed within four months.[12]

---

organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

"(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."

[10] Even though there is a showing of bias at a lower level of the association's appellate system, however, if there is an unbiased tribunal on a higher level in the hierarchy, the policies behind the exhaustion rule require that the member appeal to that higher tribunal.

[11] On its face, certainly, the two or three step appellate procedure provided for in the constitution of the International Union is not so burdensome or time-consuming as to justify immediate judicial intervention in an internal dispute.

[12] "(4) Protection of the right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or pro-

And finally, there are instances where the requirement of exhaustion of remedies would subject a member to an injury that is in a practical sense irreparable. Such a situation would arise where a person expelled from a union and suing for re-admittance would, during the interim of his appeal, be barred from working in a union shop. Our courts are aptly armed, however, to prevent such irreparable injury to plaintiffs without destroying the vitality of the exhaustion rule.[13]

We hasten to emphasize, at this point, that the subject matter of the plaintiff's complaint, the harm complained of, should have little bearing on whether at that instant our courts may exercise jurisdiction. Too often the courts have been prone to carve out new exceptions to the rule because of the appealing nature

ceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."

[13] Many associations voluntarily stay the imposition of penalty themselves, but if the association fails to do so, our courts are empowered to issue a temporary injunction staying the imposition of penalty while the member is taking an intra-association appeal. Such injunction must be based upon proof of a potential severe injury to the member and a colorable claim for relief. There need be no fear of dilatory tactics by the plaintiff since the injunction can be expressly conditioned upon his prompt exhaustion of all available internal remedies. The injunction *pendente lite*, of course, should be used but sparingly. See Summers, supra at 1096-97; Comment, 65 Yale L.J. 369, 383-85 (1956).

of the plaintiff's grievance.[14]   The more gross the error committed by the association, assuming that the situation does not fall within one of the enumerated exceptions, the more anxious we should be to permit the internal processes of the association to rectify it.   As Professor Witmer so aptly stated, "Freedom of litigation, for instance, is hardly so essential a part of the democratic process that the courts should be asked to strike down all hindrances to its pursuit.   The courts are as wise, to take an example of this, in adhering to the general requirement that all available remedies within the Union be exhausted before redress is sought before them, as they are unwise in many of the exceptions they have grafted upon this rule."   Witmer, Civil Liberties and The Trade Union, 50 Yale L.J. 621, 630 (1941).   Nor does the type of relief sought by the aggrieved member have any bearing on the application of the exhaustion rule.   *Binkowski v. Highway Truck Drivers*, 8 Pa. D. & C. 2d 254 (1957), aff'd 389 Pa. 116, 132 A. 2d 281 (1957).

We are not unaware of the strong emphasis now being accorded the problem of internal union democracy. It is with a view toward the recent important steps taken legislatively to safeguard in the federal courts the rights of individual members against organizational excesses that we today elevate the rule of exhaustion to such a prominent position in our jurisdictional scheme. The Labor Management Reporting and Disclosure Act of 1959, Title I—Bill of Rights of Members of Labor Organizations, is not an attempt by the Congress of the United States to control the internal affairs of labor organizations.   Rather, it represents the establishment of certain channels within which union activities which

[14] See Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1050-51 (1951).   See also Summers, Judicial Settlement of Internal Union Disputes, 7 Buffalo L. Rev. 405 (1958).

affect membership rights may proceed. The provisions are designed to fill the gaps found to exist in union constitutions and bylaws in regard to the procedural and substantive due process accorded members. Rights and remedies which members have long claimed and which courts have long struggled to provide are now made articulate by specific provisions dealing with (1) the right of a member to fully participate in the internal politics of the organization, (2) the member's freedom of speech, assembly and association, (3) the member's rights in regard to dues, initiation fees and assessments, (4) protection of the member's right to institute legal action and (5) safeguards against improper disciplinary action.[15] We are hopefully entering a new era in union self-discipline and responsibility. Rather than adopt judicial rules that would discourage resort to union processes which now must meet detailed elementary standards of fairness, we will attempt in every way to encourage the steady evolution of internal democracy. A strict adherence to the rule of exhaustion will go far toward placing the initial responsibility where it rightfully belongs—on the association itself. It is only when an issue has become fully "ripe" for adjudication that our courts will enter the picture.

In the instant case, appellant has averred seemingly inconsistent facts. He avers (a) that he has exhausted all remedies within the Union, and (b) that a further resort thereto would be futile. Passing over this inconsistency and treating these allegations as alternative, we find that appellant's own pleadings indicate (1) that he has not exhausted all the remedies afforded him, and

---

[15] These provisions answer in large measure the questions posed and the problems explored by Professor Summers in Judicial Settlement of Internal Union Disputes, 7 Buffalo L. Rev. 405 (1958). See also Stern, Intra-Union Activities, Membership and Collective Bargaining Rights Under Pennsylvania Law, 29 Temple L.Q. 38 (1955).

(2) that he has not alleged sufficient facts to raise an issue of futility. In Art. III, §3, of the Constitution of the International Union, it is provided that "In all questions of dispute, appeals and grievances . . . the right of appeal of an individual member shall end with the District Executive Board, . . ." In Section 2 of Art. XVIII, entitled "Charges and Methods of Trials," the Constitution states: "When any local officer or any member not an officer, is accused of violating any of the Organization's laws or any transgression against the Organization or any of its officers or members, . . . the charge must be first lodged with and prosecuted before the Local Union of which the alleged offender is a member and the decision of the Local Union shall close the case so far as that tribunal is concerned, but should the accused or his accuser be dissatisfied with the decision of the tribunal first trying the case, either shall have the right of appeal to the next highest tribunal in authority and so on until a final decision is reached, as provided in Section 3 of Article 3, . . ." Then Section 3 goes on to say: "When Sub-District Conventions are in session, they shall be recognized as intermediary trial tribunals between the Sub-District and District Executive Boards. . . ."

The Constitution thereby provides an appellate procedure which begins with the local union, proceeds to the sub-district convention if in session, continues to the district executive board and district convention, and then to the International Union. The individual member's appeal as of right, however, apparently ends with the district executive board as stated in Section 3 of Art. III. For purposes of the exhaustion rule, therefore, an appeal to the district executive board can be considered the final step. Appellant has alleged only that he demanded restoration in defendant local union. He does not allege that he took any further steps than

making demand of the local union itself. Certainly a mere allegation of exhaustion will not be held sufficient to create a triable issue of fact for the court. Such an allegation is simply a conclusion of the pleader insufficient to support jurisdiction.[16]

An examination of appellant's contention (b) that it would have been futile to proceed further indicates a similar absence of facts which might lead us to believe that appellant's complaint would not be adequately processed through the union appellate procedure. Here again, a mere allegation by the pleader of futility or illusoriness will not satisfy the jurisdictional requirement. *Durso v. Philadelphia Musical Society*, 11 Pa. D. & C. 2d 463, 469-70 (1957), affm'd 392 Pa. 30, 139 A. 2d 555 (1958). Appellant's only allegation in the complaint which bears on this issue at all is his averment that "further resort thereto would be futile and useless in view of the past and continued refusal of the defendants to process the plaintiff's grievance." Even

---

[16] When an issue of exhaustion is properly raised by the plaintiff's allegation that he followed each step in the internal procedure unsuccessfully, and the defendant then enters a denial or avers facts which show that plaintiff did not exhaust his remedies, this mixed issue of law and fact must be preliminarily decided by the trial court. Such procedure must likewise be followed where the plaintiff seeks to come within one of the narrow exceptions to the exhaustion rule. Until the exhaustion question is settled, no other aspect of the litigation should be heard.

Should appellant exhaust his internal remedies and subsequently succeed in establishing that his expulsion was due solely to his prior invocation of the judicial processes, he may indeed be entitled to reinstatement on the ground of arbitrary expulsion. See Summers, supra at 1067-68. In such a situation, a question of federal law would no doubt be involved. The Labor Management Reporting and Disclosure Act of 1959, Sec. 101(a)(4), states "No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, . . ."

were we to assume that appellant took all the necessary steps to have the Union process his discharge grievance, as required by the collective bargaining agreement, it would fly in the face of reason and logic to hold that simply because the Union refused to press appellant's grievance in negotiations with the employer, for any one of several reasons it might deem justifiable, that the appellant has thereby demonstrated that the Union will not provide an effective forum and internal procedure whereby appellant may fairly resolve a subsequent Union-member disciplinary dispute. We conclude, therefore, that aside from the procedural defect of joining this expulsion claim to the discharge claim against the Company and the individual appellees, our courts will not exercise jurisdiction to entertain the expulsion claim until the internal remedies are exhausted. Cf. *Strano v. Local Union No. 690,* 398 Pa. 97, 156 A. 2d 522 (1959).

By his claim against appellee Company and the individual appellees for an allegedly wrongful discharge in violation of his seniority rights, appellant seeks enforcement of third-party rights under the collective bargaining agreement (Agreement) between the International Union and the Company. Although generally a third party beneficiary may enforce rights flowing to him from a contract,[17] whether he may so enforce a col-

---

[17] The law of Pennsylvania in regard to the rights of a third-party beneficiary to a contract was clearly set forth in *Williams v. Paxson Coal Co.,* 346 Pa. 468, 471, 31 A. 2d 69 (1943), wherein we stated: "The foundation of any right the third party may have, whether he is a donee beneficiary or a creditor of the promisee, is the promisor's contract. Unless there is a valid contract, no right can arise in favor of anyone. Moreover, the rights of the third person, like the rights of the promisee, must be limited by the terms of the promise. . . . Broadly speaking, not only must any formal requirements be complied with, but the beneficiary also takes subject to the due performance of all express and implied conditions affect-

lective bargaining agreement raises serious problems not heretofore faced by our Court. The issue involved is of great importance to labor, to management and to the countless number of employees governed by seniority provisions in collective bargaining agreements.

A collective bargaining agreement, it is important to note, is simply a contract, and any rights and remedies the appellant possesses must be derived solely from the Agreement itself. The complaint indicates that the Agreement between the International and the signatory coal companies was first entered into on June 19, 1941. This Agreement was executed by the International on behalf of the various local unions and the individual members thereof, including the appellant. Seniority rights were expressly recognized therein. Said Agreement was amended several times in subsequent years, significantly so in regard to seniority rights on

ing the promise in which he is interested: 2 Williston on Contracts (Revised Ed.), §364(a)." See also *Rose v. Rose*, 385 Pa. 427, 123 A. 2d 693 (1956) ; Corbin on Contracts, §§817-819, 821-823 ; Restatement, Contracts, §140 ; 8 P.L.E., Contracts §164, p. 213.

Appellant's seniority rights arise only out of contract. *Gavigan v. B.M.O. & A.W. Local No. 97*, 394 Pa. 400, 147 A. 2d 147 (1959). Thus, courts in almost all jurisdictions have held that such rights, the creation of the Union-Management contracts wherein they are described, may be enforced only in accordance with the terms of such contracts. See, e.g., *Cortez v. Ford Motor Co.*, 349 Mich. 108, 84 N.W. 2d 523, 525 (1957) ; *Parker v. Borock*, 5 N.Y. 2d 156, 159, 156 N.E. 2d 297, 299 (1959) ; *Jorgensen v. Penna. R. Co.*, 25 N.J. 541, 138 A. 2d 24, 30-36 (1958) ; *Reed v. St. Louis S. W. R. Co.*, 95 S.W. 2d 887, 889 (Mo. App. 1936) ; *Norman v. Hathaway Bakeries, Inc.*, 330 Mass. 352, 113 N.E. 2d 450 (1953) ; *Glass v. Hoblitzelle*, 83 S.W. 2d 796, 802 (Tex. Civ. App. 1935) ; *Mello v. Local 4408 C.I.O. United Steelworkers*, 105 A. 2d 806 (R.I. 1954) ; *Cone v. Union Oil Co.*, 129 Cal. App. 2d 558, 564, 277 P. 2d 464, 468 (1954) ; *Miller v. Johnstown Traction Co.*, 167 Pa. Superior Ct. 421, 74 A. 2d 508 (1950) ; 31 Am. Jur., Labor, pp. 485-486, Sec. 124. Cf. *Transcontinental & Western Air, Inc. v. Koppal*, 345 U.S. 653, 73 S. Ct. 906, 97 L. Ed. 1325 (1953).

September 29, 1952. It is the seniority rights acquired under this Agreement that appellant now seeks to enforce.[18]

We have carefully read the entire Agreement and can find *no* provision which authorizes appellant to enforce it. Although the seniority provisions relied upon inure directly for the benefit of the appellant-employee and do not exist simply to protect the interests of the Union, appellant's cause of action is precluded by a contractual grievance and arbitration procedure which, by its very terms, limits access thereto to the Union. The parties in drafting this Agreement provided for a simple, expeditious and inexpensive grievance procedure to be administered by persons intimately familiar therewith.[19] The procedure outlined was de-

---

[18] ". . . seniority is not a matter that can affect one man alone; it is a definition of his relationship to a number of other individual workers. Seniority, if it is a right at all, is a vested interest in a certain specific permutation of individuals. It is a permutation which, barring disciplinary penalties, deaths, and voluntary withdrawals, can change only by promotions from the top or by additions at the bottom. It is an interest in a 'specific orderly arrangement.' As such, each of the rights is tied to all of the rest. The employer with an agreement to respect seniority which is treated as legally enforceable could not, therefore, offer to change the roster in the interest of a particular worker without laying himself open to a charge of violating the rights of other employees. Seniority in any business establishment is a whole chain of rights, rotating in accordance with a specific pattern. Thus, it is no mere accident that the collective bargaining agreement should be the typical instrument in which it is incorporated.". Christenson, Seniority Rights Under Labor Union Working Agreements, 11 Temple L.Q. 355, 371 (1937). Cf. *Grand Lodge, B. of R. & SS. C. v. Girard Lodge*, supra at 265.

[19] We have here a situation wherein Union representatives have broad discretion to receive, pass upon and withdraw grievances presented by individual employees. The United States Supreme Court has held the exercise of such discretion authorized by the Labor Management Relations Act of 1947, 61 Stat. 143, 29 U.S.C. §§157-159. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337-339, 73

signed not only to promote settlement, but also to foster more harmonious employer-employee and employer-union relations. The parties expressly sought to avoid litigation, recognizing that the courts are particularly ill-equipped to assume the role of umpire in industrial disputes. Cf. *Slocum v. Delaware, Lackawanna & Western R. Co.*, 339 U.S. 239, 70 S. Ct. 577, 94 L. Ed. 795 (1950). It should be noted that after the first step in the five outlined in the grievance procedure, the complaint is to be processed by representatives of the Union. The ultimate responsibility in discharge cases is thereby left not to individual members, but rather to their trustee in these matters. The result we reach thus flows as a matter of course from the face of the Agreement. In effect, the appellant is a beneficiary of the appellee Company's promises as to seniority rights, but the Company has limited those promises by refusing to entertain claims based on such rights (beyond the initial complaint stage) unless brought by the other party to the Agreement, the trustee Union. The limited character of the Company's promises serves to defeat any attempt to get redress individually.[20]

S. Ct. 681, 686, 97 L. Ed. 1048, 1057-58 (1953); *Anson v. Hiram Walker & Sons*, 222 F. 2d 100, 102-103 (7th Cir. 1955). See *Cox*, supra. The exercise of this discretion by Union representatives in pressing grievances and its interpretation of contract terms in the interest of all its members is subject to challenge, after exhaustion of the grievance procedure, *only* on grounds of bad faith, arbitrary action or fraud.

[20] Three important jurisdictions have recently arrived at the same result: *Parker v. Borock* (N.Y. 1959), supra; *Cortez v. Ford Motor Co.* (Mich. 1957), supra; *Jorgensen v. Penna. R. Co.* (N.J. 1958), supra; *U. S. v. Voges*, 124 F. Supp. 543 (E.D. N.Y. 1954). Cf. *McMenamin v. P.T.C.*, 356 Pa. 88, 51 A. 2d 702 (1947). See also Stern, supra at 63-64; Hanslowe, supra.

Compare *Jenkins v. Schluderberg-T. J. Kurdle Co.*, 217 Md. 556, 144 A. 2d 88 (1958); *Ostrofsky v. United Steelworkers of America*, 171 F. Supp. 782, 790-792 (D. Md. 1959).

To view this type of agreement otherwise would lead to chaos and a breakdown in the entire scheme of collective bargaining for which the parties have provided and contracted. Instead of being able to rely on the disposition of employee grievances through the established machinery, the Company would face the constant threat of attempted individual enforcement through litigation. Union responsibility would be diminished and all parties would suffer. For these reasons, most, if not all, Union-management agreements of any magnitude in force throughout the Commonwealth are similarly drafted, with an eye toward reposing enforcement responsibility in the labor organization concerned.

As Judge FULD of the New York Court of Appeals, concurring in a recent decision very similar to ours, concluded: ". . . absent specific language giving the employee the right to act on his own behalf, it is my conclusion that, under a collective bargaining agreement such as the one before us—which contains provision for the submission of unsettled disputes to arbitration—the union alone has a right to control the prosecution of discharge cases. (See Cox, Rights Under A Labor Agreement, 69 Harv. L. Rev. 601, 648-652." *Parker v. Borock*, 5 N.Y. 2d 156, 159, 156 N.E. 2d 297, 300 (1959). With this approach we wholeheartedly concur.

----

The limited nature of the appellee Company's promises serves to distinguish the instant case from *Commonwealth v. Great American Indemnity Co.*, 312 Pa. 183, 167 Atl. 793 (1933) and *Concrete Products Co. v. U. S. Fidelity & Guaranty Co.*, 310 Pa. 158, 165 Atl. 492 (1933). The same holds true for the lower court cases of *Chernko v. Moore*, 64 Pa. D. & C. 638 (1948) and *Greleck v. Amsterdam*, 20 Pa. D. & C. 351 (1934). We express our disagreement with the reasoning employed in *Roberts v. Penn Tobacco Co.*, 34 Luzerne Legal Reg. 237 (1939). Compare *Ilgenfritz v. Westinghouse Electric Corp.*, 99 P.L.J. 173 (1951).

The aggrieved member-employee, limited to seeking relief against the Union, is not without effective remedy. In entering into this Agreement, the Union has assumed the role of trustee for the rights of its members and other employees in the bargaining unit. The employees, on the other hand, have become beneficiaries of fiduciary obligations owed by the Union. As a result, the Union bears a heavy duty of fair representation to all those within the shelter of its protection. See *Syres v. Oil Workers Union,* 350 U.S. 892, 76 S. Ct. 152, 100 L. Ed. 785 (1955), reversing per curiam 223 F. 2d 739 (5th Cir. 1955); *Ford Motor Co. v. Huffman,* supra at 337-339; Cox, supra at 632-638. If the Union, in processing an employee's grievance, does not act in good faith, in a reasonable manner and without fraud, it becomes liable in damages for breach of duty.[21] In this way, the em-

---

[21] Cf. *Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 72 S. Ct. 1022, 96 L. Ed. 1283 (1952); *Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 198-199, 89 L. Ed. 173, 65 S. Ct. 226 (1944); *Tunstall v. Brotherhood of Locomotive F.E.,* 323 U.S. 210, 211, 89 L. Ed. 187, 192, 65 S. Ct. 235 (1944); *Wallace Corp. v. N.L.R.B.,* 323 U.S. 248, 65 S. Ct. 238, 89 L. Ed. 216 (1944). See 31 Am. Jur., Labor, pp. 458-459, 598-599, secs. 88, 265.

A union's duty of fair representation is founded upon the aforementioned relationship between the union and its members, as well as the duty imposed upon the union by state and federal labor statutes. See *Brotherhood of Railroad Trainmen v. Howard,* supra; *Graham v. Brotherhood of Locomotive Firemen, etc.,* 338 U.S. 232, 70 S. Ct. 14, 94 L. Ed. 22 (1949); *Steele v. Louisville & N.R. Co.,* supra; *Grand Lodge, B. of R. & SS. C. v. Girard Lodge,* supra at 251.

Professor Cox defines the union's duty toward the employee as follows: "The bargaining representative would be guilty of a breach of duty if it refused to press a justifiable grievance either because of laziness, prejudice or unwillingness to expend money on behalf of employees who were not members of the union. . . . It would be a defense to show that the union and employer had made a settlement or that the union's decision not to press the claim was honest and reasonable. . .

ployee is recompensed for the harm he had suffered, and yet the process of collective bargaining in the industry is meaningfully preserved.

Such would have been the proper theory upon which to proceed in the instant case. One of appellant's averments was that the Union representatives have arbitrarily refused to process his grievances in breach of their fiduciary duty. There is but one flaw in this reasoning. The fiduciary duty owed the member-employee is by the *Union,* and not by its individual representatives. Officials of the Union, acting in their authorized capacities, cannot be held individually liable in damages to a member-employee for failure to process a

"In evaluating the protection available through enforcement of the duty of fair representation, one must recognize that there are no ready-made standards of fairness. Plainly, the duty is violated whenever the union's handling of a grievance is influenced by union memberships or activities, union politics, the exercise of political rights, or sheer favoritism." Cox, Individual Enforcement of Collective Bargaining Agreements, 8 Lab. L.J. 850, 858-9 (1957).

Professor Hanslowe states it in this manner: "The union's conduct must not be wilful, arbitrary, capricious or discriminatory. The union must not have declined to press the grievance out of laziness or prejudice, or out of unwillingness to expend money on behalf of non-members. Its decisions with respect to individual grievances must have been honest and reasonable. The rejection of a grievance by the union must have been on the merits, in the exercise of honest discretion and/or sound judgment, following a complete and fair investigation. The rejection must not have been unjust in any respect. There must not have been bad faith or fraud. The bargaining agent must not have acted in a negligent manner." Hanslowe, supra at 46-47. See also Blumrosen, Legal Protection for Critical Job Interests: Union-Management Authority Versus Employee Autonomy, 13 Rutgers L. Rev. 631, 653-657 (1959).

For a comprehensive discussion of the right to fair representation, see Cox, The Duty of Fair Representation, 2 Vill. L. Rev. 151 (1957); Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L.J. 1327 (1958); Hanslowe, supra at 43-51.

grievance since they are but agents responsible only to the Union itself. It is the Union that is the proper target of appellant's complaint.

Since neither of appellant's causes are predicated on a breach of fiduciary obligation theory, the suit in its present posture cannot be maintained. The suit would be properly brought if directed against the Union for breach of its fiduciary obligations to appellant.[22] There is a close analogy between a claim such as this and a bill in equity which the beneficiary of a trust may maintain against the trustee who fails to press a claim against a third person. See 3 Scott, Trusts §§282, 282.1 (2nd ed.) ; Cox, supra at 652. Appellant thus has a choice of proceeding against the Union on either a trust theory or a trespass theory to gain vindication of his rights.

In view of the disposition we make in this matter, it is unnecessary for us to consider appellees' further contention that our jurisdiction is completely ousted by federal pre-emption under the Labor Management Relations Act of 1947.

Order affirmed at appellant's cost.

Mr. Justice BELL and Mr. Justice BENJAMIN R. JONES dissent.

---

[22] Quite apart from the question of federal pre-emption, the employer may be joined, under the proper circumstances, as a co-defendant for participating in the Union's breach of its fiduciary obligations.