**Joel D. POSNER, M.D. and Pulmonary Medical Services, P.C.**

v.

**The LANKENAU HOSPITAL, the Medical Staff of the Lankenau Hospital, Michael A. Manko, Margaret Anderson, William G. Figueroa, Robert K. Jones, R. Barrett Noone, Edward A. Chasteney, 3rd, Miles H. Sigler, Ferrell G. Pauletto, Gordon W. Webster.**

**Civ. A. No. 82–1387.**

United States District Court, E.D. Pennsylvania.

Sept. 9, 1986.

Barbara A. Podell, Robert J. LaRocca, David H. Weinstein, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for plaintiffs.

J. Bruce McKissock Associates, P.C., J. Bruce McKissock, Philadelphia, Pa., for Jones, Noone, Chasteney, Pauletto and Webster.

Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., George E. Rahn, Jr., for The Lankenau Hosp. and the Medical Staff.

Marc Durant, Philadelphia, Pa., for Margaret Anderson, M.D. and William G. Figueroa, M.D.

## OPINION

VANARTSDALEN, Senior District Judge.

Joel D. Posner, M.D., on behalf of himself and his corporation, Pulmonary Medical Services, P.C., filed this action on March 26, 1982, naming Lankenau Hospital, the Lankenau Medical Staff, and eleven[1] individual members of the Medical Staff as defendants. Plaintiff alleges that the defendants' refusal to allow him an associate on the Lankenau Medical Staff, of which he was a member, and their denial of his reappointment to the Medical Staff were in violation of section 1 of the Sherman Act and Pennsylvania's common law prohibiting unreasonable restraints of trade. Posner also asserts that defendants breached his contract with Lankenau Hospital and tortiously interfered with his contract rights and prospective contractual relations with other parties. Plaintiff and defendants submitted cross-motions for summary judgment. Following oral argument, both parties' motions were denied with respect to the antitrust claims. Regarding plaintiff's breach of contract and tortious interference claims, plaintiff's motion was denied and defendants' motion was taken under advisement. For the reasons stated below, defendants' motion will be granted in part and denied in part with respect to these claims.

The following facts are undisputed. Dr. Posner joined the Lankenau Medical Staff on July 1, 1975, with admitting privileges in the Division of Internal Medicine and the Division of Pulmonary Diseases. Between 1977 and 1980, plaintiff sought to add an additional pulmonary physician to the Lankenau staff who would be affiliated with him. None of the candidates proposed by Dr. Posner were granted membership to the Lankenau Medical Staff.

On September 11, 1980, plaintiff requested a one-year leave of absence from the Lankenau Medical Staff, effective as of November 1, 1980. He was granted a leave of absence until June 30, 1981. Plaintiff also entered into a contract with Dr. Robert Promisloff on September 29, 1980, which provided that Dr. Promisloff would take over Dr. Posner's practice as of November 1, 1980. The contract also gave

---

1. Plaintiff originally named Howard P. Wood and Joseph H. Cooper as defendants. The parties have stipulated that all charges against these two defendants be dismissed with prejudice.

Promisloff the option to purchase the practice in the event Posner did not desire to return to active practice.

At their June 2, 1981 meeting, the Executive Committee of the Lankenau Medical Staff, acting on the advice of the Credentials Committee and defendants William Figueroa, M.D., and Michael Manko, M.D., recommended that plaintiff's reappointment to the Lankenau Medical Staff be denied, and notified Posner of this decision in a letter dated June 4, 1981. Ironically, Posner had written a letter to Dr. Cooper, President of the Lankenau Medical Staff, dated June 4, 1981, requesting a one-year extension of his leave of absence.

Posner requested and was granted a hearing before the Fair Hearing Committee, as was his right under the Lankenau Medical Staff Bylaws. The Hearing Committee was composed of defendants Robert K. Jones, M.D., R. Barrett Noone, M.D., and Edward A. Chasteney, 3rd, M.D. The Hearing Committee determined that the Executive Committee's decision to deny Posner's reappointment was proper. After receiving this recommendation, the Executive Committee forwarded to the Lankenau Board of Trustees their final decision to deny plaintiff's reappointment. Plaintiff took no other action prior to the commencement of this suit.

Both parties have moved for summary judgment. Summary judgment should not be granted unless the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981). Further, all reasonable inferences must be drawn in favor of the nonmoving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

For the reasons stated hereafter, I will grant defendants' motion with respect to plaintiff's breach of contract claims concerning the defendants' refusal to allow him an associate on the Lankenau staff and their alleged failure to provide him with a hearing on the decision to deny his reappointment. I also conclude that defendants are entitled to summary judgment on the tortious interference claims concerning plaintiff's contracts with Lankenau Hospital and the Medical Staff, his patients, and Dr. Promisloff. Because I have determined that, under Pennsylvania law, plaintiff's contract claims are not barred by his failure to completely exhaust his contractual remedies, I will deny defendants' motion on this issue. Since the record indicates that material questions of fact exist concerning the remainder of plaintiff's claims, defendants' motion will be denied with respect to these claims. Additionally, I hold that defendants are not immune from federal antitrust liability pursuant to the "state action" immunity doctrine.

### Breach of Contract

■ Plaintiff claims that defendants are liable, under Pennsylvania law, for breach of contract. Under Pennsylvania law, the Staff Bylaws of Lankenau Hospital constitute a contract between the hospital and the staff. *Berberian v. Lancaster Osteopathic Hospital Association*, 395 Pa. 257, 149 A.2d 456 (1959); *Miller v. Indiana Hospital*, 277 Pa.Super. 370, 419 A.2d 1191 (1980). Posner asserts that defendants breached the Bylaws by: (1) refusing, in bad faith, to add a physician to the Medical Staff who would associate with him; (2) failing to afford him a hearing on the decision not to reappoint him; and (3) denying his reappointment to the Medical Staff without regard to the criteria contained in the Bylaws.

Posner contends that because the defendants' refusals to grant Medical Staff membership to any of his prospective associates were made in furtherance of the defendants' anticompetitive objectives, defendants breached the contract set out in the Bylaws. Each party to a contract has an implied duty under Pennsylvania law to act in good faith and deal fairly with the other parties to the contract during the performance and enforcement of the contract. *See*

*Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 378, 390 A.2d 736, 742 (1978); *Daniel B. Van Campen Corp. v. Building and Construction Trades Council,* 202 Pa.Super. 118, 122, 195 A.2d 134, 136–37 (1963). However, the failure to deal with another party in good faith concerning something to which the complaining party has no right under the terms of the contract cannot constitute a breach of that contract. As the court in *Van Campen* stated:

> In the absence of an express agreement, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do *in order to carry out the purpose for which the contract was made* and to refrain from doing anything that would destroy or injure *the other party's right to receive the fruits of the contract.* Accordingly, a promise to do an act necessary to carry out the contract must be implied.

*Daniel B. Van Campen Corp. v. Building and Construction Trades Council,* 202 Pa. Super. at 122, 195 A.2d at 136–37 (emphasis added).

■ The Lankenau Bylaws do not provide members of the Medical Staff with the right to an associate on the Lankenau staff.[2] The Supreme Court of Pennsylvania has held that it will not grant physicians broader contractual rights beyond those explicitly stated in the bylaws. *Adler v. Montefiore Hospital Association of Western Pennsylvania,* 453 Pa. 60, 311 A.2d 634 (1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974) (plaintiff physician had no entitlement to perform laboratory procedures merely because he was a member of the medical staff). Assuming, for the purposes of this issue, that defendants' denials of plaintiff's

requests for an associate were made in bad faith, Posner's claim for breach of contract must fail, since he had no contractual right to an associate on the Lankenau staff. Therefore, defendants' motion will be granted on this issue.

Posner makes a second breach of contract claim in his motion for summary judgment, asserting that he was not afforded a hearing on the decision not to reappoint him. The Bylaws provide that any member of the Medical Staff who is not reappointed has the right to a hearing before the Hearing Committee. Posner requested a hearing which was held on July 9, 1981. Plaintiff asserts that this hearing focused on the decision not to renew his leave of absence and that, in essence, he was never given a hearing concerning the decision not to reappoint him to the Lankenau Medical Staff.

■ A review of the transcript of the hearing indicates that all the alleged reasons for defendants' denial of plaintiff's reappointment were discussed at the hearing. Additionally, Posner had no right to a hearing concerning the sole issue of nonrenewal of his leave of absence.[3] The record does not support a reasonable inference that plaintiff was not given the hearing on the decision not to reappoint him. *Cf. Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 883 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Bank of America National Trust & Savings Association v. Hotel Rittenhouse Associates,* 595 F.Supp. 800, 802 (E.D.Pa.1984) (where no reasonable resolution of the conflicting evidence and inferences drawn from it could result in a judgment for the nonmoving party, granting of summary judgment is appropriate). This

**2.** Section 2.1 of Article 4 of the Bylaws provides that staff membership "depends on the availability of hospital beds and facilities requested by the applicant and the needs of the hospital." The Lankenau Bylaws were revised effective June 1, 1980. The Bylaws which were in effect prior to 1980 contained a similar provision.

**3.** Article 7, Section 2 of the Bylaws provides that the following actions of the Executive Commit-

tee entitle the Medical Staff members affected by the decision to a hearing:

(1) Denial of advancement in Medical Staff category.
(2) Denial of Medical Staff reappointment.
(3) Revocation of Medical Staff membership.
(4) Denial of requested increased clinical privileges.
(5) Suspension of clinical privileges.
(6) Reduction of clinical privileges.

court is not in a position to determine whether the hearing was conducted properly. Under the Bylaws, the plaintiff had a right to a hearing on the decision not to reappoint him to the Medical Staff. I conclude that he received the hearing to which he was entitled.

Posner's third breach of contract claim is that the denial of his reappointment was not based on the criteria for reappointment contained in the Bylaws. The criteria governing reappointment decisions is set out in Section 5 of Article 4 of the Bylaws. Pursuant to Section 5, recommendations for reappointment are to be based on "each member's professional competence and clinical judgment in the treatment of patients, his fulfillment of teaching and service responsibilities, his ethics and conduct, his health status, his attendance at medical staff meetings and his compliance with the Medical Staff Bylaws, Rules and Regulations."

██ Plaintiff asserts that his reappointment was denied because defendants wished to prevent him from competing with the other members of the Pulmonary Division. Defendants contend that their decision not to reappoint plaintiff was based on his conduct, *i.e.*, his interpersonal conflicts with Dr. Anderson and his actions which were inconsistent with his stated desire to remain at Lankenau. Since the record indicates that questions of fact exist concerning the reasons why Posner's reappointment was denied, I will deny defendants' motion on this issue.

*Exhaustion of Contractual Remedies*

Defendants assert that Posner's failure to appeal the Executive Committee's final decision to uphold its denial of Posner's reappointment bars his contract claims. Article 7, section 11(1) of the Bylaws provides that a staff member has ten days in which to submit a request for an appeal before the Board of Trustees challenging a decision of the Executive Committee. Section 11(1) further provides that if an appeal is not requested within ten days of receipt of the Executive Committee's decision, "both sides shall be deemed to have accepted the action involved and it shall be effective immediately." Posner did not appeal the Executive Committee's final decision not to reappoint him.

Plaintiff challenges this assertion, stating that because the letter notifying him of the Executive Committee's final decision stated that the matter "had been submitted to the Board of Trustees through the Joint Conference Committee for final deliberation," he was "entitled to expect ... that the procedural requirements of an appeal would then be implemented." Plaintiff reasons that the reference to a "final deliberation" could have been inferred to mean that the Executive Committee had appealed its own decision to the Board of Trustees, preventing the decision from becoming final. Section 11(1) allows the Executive Committee to appeal only when the Board of Trustees has ruled adversely to a member after a favorable Executive Committee recommendation. Since the Board of Trustees had not made any final ruling at the time plaintiff received the letter noted above, and because their decision was in agreement with the Executive Committee's recommendation, precluding the Executive Committee from taking any appeal, this argument is implausible and I reject it as a matter of law.

Plaintiff also argues that because the Executive Committee notified him only of the denial of his request for an extended leave of absence, not the final decision to deny his reappointment, this court cannot find that he failed to exhaust his contractual remedies. Since an examination of the record indicates that plaintiff was aware that the Executive Committee had denied his reappointment as well as an extension of his leave of absence, this argument merits no discussion.[4] Because I conclude that

---

4. In his final reply brief, plaintiff claims that defendants' failure to specify the factual basis of their waiver defense in their answers to plaintiff's interrogatories precludes defendants from asserting that plaintiff waived his right to claim breach of contract due to his failure to fully

plaintiff failed to completely exhaust his contractual remedies which were contained in the Bylaws, the question to be determined is whether, under Pennsylvania law, this failure precludes him from proceeding with his contract claims.

■ Research fails to reveal any Pennsylvania case law ruling on the precise issue before me. Where there are no precedents directly on point to guide this court when deciding issues of state law, I must predict how that state's courts would rule. *See Samuelson v. Susen,* 576 F.2d 546 (3d Cir.1978). A survey of decisions indicates that, if faced with the instant situation, the Pennsylvania Supreme Court would hold that plaintiff's failure to completely exhaust his contractual remedies does not bar his contract claims.

The Pennsylvania Supreme Court has held that a court may not exercise jurisdiction over claims brought by members of an unincorporated association unless all internal remedies afforded by the association have been exhausted. *See Falsetti v. Local Union No. 2026, United Mine Workers of America,* 400 Pa. 145, 161 A.2d 882 (1960). *See also Borough of Ambridge Water Authority v. J.Z. Columbia,* 458 Pa. 546, 328 A.2d 498 (1974) (when parties contract to arbitrate disputes, one party may not bring suit until attempt has been made to resolve dispute through arbitration).

Pennsylvania courts have carved out exceptions to this general rule in situations where the internal remedies would not, in reality, yield a remedy, or when adherence to the general rule would cause irreparable harm to a potential plaintiff. 400 Pa. at 159, 161 A.2d at 889–90. *Cf. Central Contracting Co. v. C.E. Youngdahl & Co., Inc.,* 418 Pa. 122, 133, 209 A.2d 810, 815 (1965) (agreement by parties to litigate all disputes in a specific county court system will not be enforced if it "would, under all circumstances existing at the time of litigation, seriously impair plaintiff's ability to pursue his cause of action").

■ Pursuant to the Bylaws, plaintiff's failure to appeal the adverse decision of the Executive Committee within the prescribed time period precludes him from any further appeals before the Lankenau Hospital administration. Ruling that plaintiff's failure to exhaust his contractual remedies prevents this court from entertaining his contract claims will deprive him of any opportunity to seek redress for these claims. I conclude that this is the type of irreparable harm that would constitute an exception to the general exhaustion requirement under Pennsylvania law. Research discloses no Pennsylvania court that has applied the exhaustion requirement when doing so would leave the plaintiff without any means of obtaining relief.[5]

pursue his contract remedies. Plaintiff has cited no legal authority in support of this claim. Plaintiff has presented defendants' answer to Plaintiff's Second Set of Interrogatories to Defendants, in which defendants were requested to "[s]et forth in detail all facts which you contend support" their defense of waiver. Defendants did not include Posner's failure to exhaust contractual remedies in their reply.

Plaintiff admits, however, that defendants raised the defense of waiver in the Sixth Affirmative Defense of their Answer and Amended Answer, in accordance with Rule 8(c) of the Federal Rules of Civil Procedure. Although I consider plaintiff's argument unpersuasive, I need not decide this question since I have determined that plaintiff's failure to exhaust his contractual remedies does not bar him from asserting his contract claims.

5. In *Beeman v. Supreme Lodge,* 215 Pa. 627, 64 A. 792 (1906), the court held that the plaintiff

was precluded from maintaining an action because she and her deceased husband had failed to follow the bylaws of the defendant association in their attempt to secure his reinstatement in the association and to secure death benefits for herself. *Id.* at 630, 64 A. at 793. The specific bylaw provision which stipulated the procedures to be followed provided that no lawsuit could be initiated until the remedies provided in the bylaws had been exhausted. *Id.* at 631, 64 A. at 793.

The provision in *Beeman* did not set any time limit for invoking the contractual procedures, so that the plaintiff was not precluded from attempting to invoke the internal remedy, unlike the plaintiff in the instant case. Additionally, in contrast to the Lankenau Bylaws, the bylaws in *Beeman* stipulated that no legal action could be commenced until all internal procedures had been utilized.

None of the cases cited by defendants compels a different conclusion. In *Berberian v. Lancaster Osteopathic Hospital Association, Inc.*, 395 Pa. 257, 149 A.2d 456 (1959), the plaintiff physician appealed from the denial of a preliminary injunction preventing his dismissal from the medical staff of the defendant hospital. The issue before the Pennsylvania Supreme Court was whether the plaintiff should have been given a hearing prior to his dismissal. 395 Pa. at 261, 149 A.2d at 457. Because it determined that the hospital's bylaws provided the plaintiff with the right to a hearing, the *Berberian* court issued an injunction restraining the defendants from dismissing the plaintiff until he received the hearing to which he was entitled pursuant to the bylaws. 395 Pa. at 265–66, 149 A.2d at 460.

In *Miller v. Indiana Hospital*, 277 Pa. Super. 370, 419 A.2d 1191 (1980), the plaintiff physician charged the defendant hospital with breach of contract, and appealed from the denial of a permanent injunction preventing revocation of his staff privileges. The court held that the defendant's conduct was not comparable to the type of impermissible breach committed by the defendants in *Berberian*, since the court determined that the hospital's deviations from the bylaws were minor, were eventually cured by the defendant, and caused no prejudice to the plaintiff. *Id.* at 375, 419 A.2d at 1193–94. In response to plaintiff's allegations that he was deprived of his due process rights, the court reasoned that these claims had to be assessed according to the standards set forth in the hospital's bylaws. 277 Pa.Super. at 379, 419 A.2d at 1195. Since the court determined that the bylaws provided him with comprehensive safeguards, and that the hospital substantially complied with the procedures set forth in the bylaws, it affirmed the denial of injunctive relief. *Id.* at 380, 419 A.2d at 1196.

Neither of the decisions described above support defendants' position. *Berberian* held that a hospital must provide its medical staff with all procedural protections provided in the hospital bylaws before taking any action adverse to the interests of a staff member. Defendants assert that "[i]t follows that if a hospital must follow the procedures set forth in its bylaws, a physician also must invoke the available remedies before suing for breach of contract." I need not rule on the logic of this argument, since I conclude that it is not the law of the Commonwealth of Pennsylvania to be applied in this case. *Cf. O'Neill v. United Association of Journeymen Plumbers and Steam-Fitters of United States and Canada*, 348 Pa. 531, 36 A.2d 325 (1944) (plaintiffs brought action in equity alleging that the union deprived them of their rights under the contract; court rejected defense of plaintiffs' failure to exhaust internal remedies because defendants had flagrantly breached the contract and resort to internal union remedies would have deprived plaintiffs of opportunity for redress for an unreasonably long period of time).

Although defendants do not make it clear, presumably they cite *Miller* in support of the proposition that defendants cannot be liable for breach of contract since their alleged breaches were, at most, *de minimis*, and that Posner deprived the defendants of an opportunity to cure the alleged violations by his failure to exercise his right of appeal to the Lankenau Board of Trustees. Because I have determined that there are questions of fact concerning the alleged breaches by the defendants, which, if proved at trial, would amount to more than *de minimis* deviations from the Bylaws, *Miller* is distinguishable from the instant case. Since I conclude that, under Pennsylvania law, the plaintiff's failure to exhaust his contractual remedies does not preclude him from asserting his breach of contract claim, I will deny defendants' motion for summary judgment on this issue.

*Tortious Interference with Plaintiff's Contractual Relations with Lankenau Hospital and the Lankenau Medical Staff*

Plaintiff asserts that defendants are liable for intentionally interfering with his contractual relations. Posner's first claim

is that Drs. Manko, Figueroa, Jones, Chasteney and Noone tortiously interfered with his contract with the Medical Staff and Lankenau Hospital by intentionally and improperly denying his reappointment to the Medical Staff. Dr. Manko, as Chairman of the Department of Internal Medicine, and Dr. Figueroa, as the new Chief of the Pulmonary Division, actively supported the decision not to reappoint plaintiff to the Medical Staff. Drs. Jones, Chasteney and Noone were members of the Hearing Committee which recommended that the Executive Committee's decision to deny Posner's reappointment be upheld.

The Pennsylvania Supreme Court has adopted section 766 of the *Restatement (Second) of Torts*, which states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Restatement (Second) of Torts*, § 766 (1979); *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *appeal dismissed*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). In order to incur liability under section 766, the defendants must have prevented a "third person" from performing a contract between the third person and Posner. Defendants contend that since each of the named defendants was a member of the Medical Staff, acting on behalf of the Medical Staff and Lankenau Hospital, and therefore a party to the contract between the Medical Staff and Lankenau Hospital formed by the Bylaws, none of them could have prevented a "third person" from performing a contract with Posner.

■ As noted earlier, the Lankenau Bylaws constitute a contract between the hospital and the Medical Staff. *See Berberian v. Lancaster Osteopathic Hospital Association, Inc.*, 395 Pa. 257, 149 A.2d 456 (1979). The defendants in the instant case, as members of the Lankenau Medical Staff, were parties to the contract created by the Bylaws. Therefore, as a matter of law, they cannot be held liable under section 766 for tortiously interfering with plaintiff's contractual relations with Lankenau Hospital or the Lankenau Medical Staff. *See, e.g., Wells v. Thomas*, 569 F.Supp. 426 (E.D.Pa.1983).

### Plaintiff's Patients

■ Posner also claims that defendants intentionally interfered with his continuing and prospective business relations with his patients. He contends that, as a result of defendants' actions, he could no longer treat his patients at Lankenau. Because Posner admitted at his deposition that he had no contracts with any of his patients or with any other physicians to refer patients to him, this claim is not cognizable under section 766.

Plaintiff also contends that defendants' actions caused him to lose prospective patients. This claim falls within the ambit of section 766B of the Second Restatement, which provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*Restatement (Second) of Torts*, § 766B (1979). *See also* § 766, comment g. The type of relation protected by section 766B is the prospect of obtaining employment or potentially profitable contracts. Section 766B, comment c. In order to prevail on a section 766B claim, plaintiff must establish that there was a reasonable likelihood or probability that the anticipated business arrangement would be completed. *Behrend*

*v. Bell Telephone Co.*, 242 Pa.Super. 47, 363 A.2d 1152 (1976), *vacated on other grounds*, 473 Pa. 320, 374 A.2d 536 (1977). The plaintiff in *Bell*, an attorney, brought a claim for tortious interference with contractual relations against Bell Telephone, claiming that he lost prospective clients as a result of frequent telephone malfunctions. 242 Pa.Super. at 61–62, 363 A.2d at 1159. Plaintiff offered no proof at trial that any individual who would have hired plaintiff was discouraged to do so because he had difficulty reaching plaintiff's office by telephone. *Id.* at 62, 363 A.2d at 1159–60. Because of this lack of proof, the *Bell* court concluded that the lower court improperly refused to grant the defendant's motion for j.n.o.v. on this claim. *Id.* at 63, 363 A.2d at 1160.

■ Plaintiff has alleged the existence of referral and/or consultation patterns at Lankenau Hospital. He argues that defendants' actions deprived him of obtaining patients through this network.[6] *See Restatement (Second) of Torts*, § 766B, comment c ("included is interference with a continuing business or other customary relationship not amounting to a formal contract"). Since questions of fact exist concerning the reasonableness of plaintiff's expectation of gaining prospective patients through referrals from other physicians at Lankenau, defendants' motion on this issue will be denied.

### Virgin Islands' Hospitals

■ Posner also contends that not being allowed an associate on the Lankenau staff caused him to lose a prospective contract for furnishing diagnostic services to hospitals in the Virgin Islands. Posner stated in an affidavit that he had received an oral offer in 1978 to enter into such a contract. Defendants contend that Posner cannot proceed with this claim because no written contract was ever prepared. A plaintiff need not establish that a written contract was drawn up in order to prevail

on a section 766B claim. *See Behrend v. Bell Telephone Co.*, 242 Pa.Super. at 62, 363 A.2d at 1159–60. I conclude that the plaintiff has established the existence of the prospective contract with the Virgin Islands' hospitals with sufficient certainty to withstand defendants' motion for summary judgment on this issue.

■ Defendants further contend that their refusal to allow plaintiff an associate on the Lankenau staff was not the cause of plaintiff's failure to obtain this prospective business relation. Plaintiff asserts that the defendants' actions caused him to incur an inordinate work load and forced him to abandon his plans for the prospective contract in the Virgin Islands. Because defendants have not demonstrated that plaintiff will be unable to establish that defendants' actions effectively prevented him from obtaining this or any other prospective business relations, I conclude that questions of fact exist concerning the issue of causation regarding plaintiff's tortious interference claims.

■ Defendants argue that they cannot incur liability for this alleged interference because none of the defendants knew the terms of the proposal. They assert that pursuant to the Pennsylvania Supreme Court's decision in *Klauder v. Cregar*, 327 Pa. 1, 6–8, 192 A. 667, 670 (1937), the plaintiff must establish that the defendants had knowledge not only of the existence of the contractual relationship with which they allegedly interfered, but also the terms of the contract. Section 766 of the Second Restatement requires that "the actor must have knowledge of the contract with which he is interfering and of the fact he is interfering with the performance of a contract." *Restatement (Second) of Torts*, § 766, comment i. It does not require knowledge of the specific terms of the contract. Since section 766 has been adopted by the Supreme Court of Pennsylvania sub-

---

**6.** Posner will have to prove at trial that there were specific patients which other doctors would have referred to him if he had remained at Lankenau. A bare assertion that, but for defendants' actions, Posner would have been able to obtain more patients is an insufficient basis for a section 766B claim.

sequent to the decision in *Klauder*, it is controlling. *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. at 431, 393 A.2d at 1183. Furthermore, *Klauder* does not support a different result.

The plaintiff in *Klauder*, an attorney, entered into a contingency agreement with Mrs. Burgess, whose husband had been killed in an automobile accident. 327 Pa. at 3, 192 A. at 668. The contract provided that the plaintiff was to receive half of whatever sum Mrs. Burgess recovered as a result of the action which plaintiff instituted on behalf of Mrs. Burgess and her late husband. *Id.* Before trial, Mrs. Burgess settled with the insurance company and did not give any part of the proceeds to her attorney, since the insurance agent told her that she did not have to pay plaintiff if she settled the case out of court. 327 Pa. at 3–5, 192 A. at 669. This advice was contrary to the language of the contract. *Id.* at 3, 192 A. at 668. The supreme court reversed the lower court's decision in favor of the defendant insurance company, holding that the plaintiff had stated and proved a cause of action for inducing breach of contract. *Id.* at 10, 192 A. at 671.

The court in *Klauder* distinguished a Massachusetts case from the one before it, stating that in the Massachusetts case, the defendant was not aware of terms of the contract which provided that the attorney's fee was to be based on the amount recovered, whereas in *Klauder*, the court had proof that the defendant insurance company knew about the contract with the plaintiff. *Id.* at 7, 192 A. at 670. In the context of the facts of *Klauder*, this does not amount to more than the requirement that the defendant must be aware that his actions will interfere with the performance of a contract between the plaintiff and a third party.

In his affidavit, Posner claims that "everyone" at Lankenau knew of his prospective contract in the Virgin Islands. However, this allegation does not establish that defendants were aware that their actions would interfere with this potential agreement. Because questions of fact ex-

ist concerning the question of whether defendants knew that their actions would interfere with plaintiff's prospective business relations in the Virgin Islands, as well as on the issue of causation, I will deny defendants' motion on this issue.

### Potential Medical Partners

█ Plaintiff asserts that defendants interfered with his prospective contractual relations with other physicians with whom plaintiff had intended to affiliate by denying their appointment to the Lankenau Medical Staff. Defendants contend that Posner has presented no evidence that any of his potential associates refused to enter into contracts with him because of their failure to be appointed to the Lankenau staff, and that the evidence demonstrates that it was Posner who chose not to enter into contracts with his prospective associates. Although defendants' assertion appears to be correct, it does not entitle them to a grant of summary judgment on this issue. If plaintiff can demonstrate that he declined to enter into contracts with his prospective associates because it would have been unfeasible to do so as a result of the prospective associates being denied staff privileges, defendants could incur liability pursuant to section 766B. *See Restatement (Second) of Torts*, § 766B(b).

The defendants also argue that denying their motion regarding this issue will allow any physician who supported an unsuccessful hospital membership application of a candidate with whom the physician wished to associate to state a cause of action for tortious interference. This argument is unfounded. In order to proceed with a tortious interference claim, the plaintiff must allege that the defendant's conduct was improper. *Restatement (Second) of Torts*, §§ 766, 766A, 766B. Section 767 lists the following factors which are to be considered in determining the propriety of an actor's conduct:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Restatement (Second) of Torts*, § 767 (1979); *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. at 433, 393 A.2d at 1184.

■■ Plaintiff contends that defendants' rejections of his proposed candidates for Lankenau staff membership were made to further the defendants' personal interests and to hamper the plaintiff's ability to compete within the Pulmonary Division. Posner points out that after he had made repeated attempts to add an associate to the Medical Staff, Dr. Beatty was granted staff privileges in 1978 as an associate of Dr. Anderson, who was the Acting Chief of the Pulmonary Division. Dr. Peterson, who had applied for staff privileges in 1979 as a potential associate of plaintiff, was granted membership to the Lankenau staff in 1981 and became an associate of Dr. Figueroa.

Defendants assert that they had legitimate justifications for their actions. They argue that the decision to allow Dr. Anderson an associate rather than plaintiff was based on seniority. They also contend that Dr. Peterson's initial application was rejected because it had been submitted while a search for a new Chief of the Pulmonary Division was in progress, during which time no staffing decisions were to be made.

Since questions of fact exist concerning the defendants' motives and the interests they sought to advance by refusing to accept the candidates whom plaintiff proposed for staff membership, the propriety of defendants' conduct for the purposes of plaintiff's tortious interference claims is an issue to be decided at trial. Consequently, I will deny defendants' motion for summary judgment on this issue.

*Dr. Promisloff and Haverford Hospital*

Posner contends that defendants' actions prevented him from performing his contracts with Dr. Promisloff and Haverford Hospital. Section 766A of the Second Restatement, which applies to these claims, states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

*Restatement (Second) of Torts*, § 766A (1979).

■■ The contract with Dr. Promisloff (which later included Dr. Lenchner) was entered into on September 29, 1980, and provided for Dr. Promisloff to take over Posner's office practice and his practice at Haverford Hospital while Posner took his leave of absence. Under the contract, Posner had the option of returning to active practice with Dr. Promisloff or selling his practice to Promisloff. Posner asserts that defendants' actions adversely affected his health and rendered him unable to return to active practice, thus preventing him from exercising his option and forcing him to sell his practice to Drs. Promisloff and Lenchner. Even if Posner can prove these facts at trial, defendants cannot be liable for tortious interference with the contract between Posner and Promisloff, since the alleged conduct of defendants did not prevent plaintiff from performing his contract with Dr. Promisloff.[7] While Posner cannot state a section 766A claim for

7. Plaintiff's claim that, but for defendants' actions, his practice would have been worth more, and thus he would have received more for his practice when he sold it to Drs. Promisloff and Lenchner under the terms of the contract, is not cognizable as one for tortious interference with contractual relations. As long as plaintiff's practice was sold in accordance with the terms of the contract, he received everything to which he was entitled under the agreement.

tortious interference with his contract with Dr. Promisloff, he may have a cognizable claim under section 766B for tortious interference with prospective contractual relations, in that defendants' actions prevented him from exercising his option to practice medicine with Drs. Promisloff and Lenchner. *Cf. Restatement (Second) of Torts*, § 766B, comment c (includes interference with exercise of an option to renew or extend contract).

Plaintiff also asserts that defendants tortiously interfered with his contract at Haverford Hospital. Posner became a member of the pulmonary staff at Haverford Hospital in 1979. He resigned from this position in 1984. He argues that defendants' actions had such an adverse affect on his health that he was forced to resign from the Haverford staff. Since I have already determined that questions of fact exist concerning the issue of causation, defendants' motion regarding plaintiff's contract with Haverford Hospital will be denied.

### Parker Immunity

Defendants assert that they are immune from federal antitrust liability pursuant to the "state action" immunity doctrine, which was first enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Supreme Court held that the Sherman Act did not prohibit states from imposing restraints on competition. 317 U.S. at 352, 63 S.Ct. at 314. The state action in *Parker* consisted of the establishment of a cartel of private raisin producers designed to stabilize prices and increase economic efficiency in the raisin industry. 317 U.S. at 346, 63 S.Ct. at 311. Although the scheme was intended to reduce competition among raisin producers, the court determined that Congress did not intend to prevent states from regulating their domestic commerce when it passed the Sherman Act. *Id.* at 352, 63 S.Ct. at 314.

The defendant in *Parker* was a state official; however, the Supreme Court has applied the *Parker* doctrine to suits against private parties. *See Southern Motor* *Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 83 L.Ed.2d 36 (1985). The circumstances under which *Parker* immunity is available to private parties was articulated in the Supreme Court's decision in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In *Midcal,* the court fashioned a two-pronged test for determining whether state regulation of private parties is immune from antitrust liability. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy." 445 U.S. at 105, 100 S.Ct. at 943. Second, the state must actively supervise any private anticompetitive conduct. *Id.*

The California statutory scheme, as it existed at the time *Midcal* was filed, required all wine producers and wholesalers to file fair trade contracts and price schedules with the state. 445 U.S. at 99, 100 S.Ct. at 940. If a producer failed to set prices by contract, the wholesalers were required to post a resale price schedule. *Id.* All wine had to be sold at the prices set by contract or price schedule. *Id.* Defendant Midcal was a wine producer who had been charged with selling wine at a price below that set by a producer's price schedule. *Id.* at 100, 100 S.Ct. at 940. Midcal petitioned the state court for an injunction against the California Department of Alcoholic Beverage Control, acknowledging that under the challenged system, the state could fine Midcal or suspend its license because of its conduct. *Id.*

Analyzing the California regulatory scheme, the *Midcal* Court first determined that the challenged restraint had been "clearly articulated and affirmatively expressed as state policy," since the regulations explicitly permitted resale price maintenance. *Id.* at 105, 100 S.Ct. at 943. The court then held that because, under the pricing system, the state neither established prices nor reviewed or regulated the terms of the fair trade contracts or price schedules, but instead merely authorized the price fixing and enforced the prices set

by the private parties, the California statutory scheme did not satisfy the second prong of its standard. *Id.*

The Supreme Court recently applied the *Midcal* test in *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In *Southern Motor Carriers,* the government alleged that the defendants, private associations of motor common carriers operating in four southeastern states, had violated section 1 of the Sherman Act by conspiring with their members to fix rates for the interstate transportation of general commodities, and brought an action to enjoin the defendants' practices. 105 S.Ct. at 1722. The defendant associations, known as "rate bureaus," submitted joint rate proposals to the Public Service Commissions in their respective states for approval. *Id.* at 1723–24. In all four states, common carriers were allowed to agree on rate proposals prior to submitting them to the states' regulatory agencies. *Id.* at 1724.

The Court began its analysis by declaring that the first prong of the *Midcal* test did not require that the state policy in question compel anticompetitive conduct by the regulated parties. 105 S.Ct. at 1726–30. The Court stated that "[t]he federal antitrust laws do not forbid the states to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties." *Id.* at 1728 (emphasis in original). Referring to the first prong of the *Midcal* test, the Court stated that "a state policy that expressly *permits,* but does not compel, anticompetitive conduct may be 'clearly articulated within the meaning of *Midcal.*'" 105 S.Ct. at 1729 (emphasis in original) (footnote omitted). Since the government conceded that the state Public Service Commissions actively supervised the collective ratemaking activities of the rate bureaus, the outcome of the case turned on the Court's analysis under the first prong of the *Midcal* test. 105 S.Ct. at 1730.

The *Southern Motor Carriers* Court stated that to satisfy the first prong of the *Midcal* analysis, the collective ratemaking must have been clearly sanctioned by the state legislatures. *Id.* Three of the four states involved had passed statutes which explicitly permitted collective ratemaking by common carriers. *Id.* Mississippi, the only state which had not directly addressed collective ratemaking, had a statute which allowed the Mississippi Public Service Commission to set "just and reasonable" rates for intrastate transportation of general commodities. *Id.* The Court determined that the Mississippi legislature had clearly expressed its intent to allow a regulatory agency, rather than the market, to determine intrastate rates. *Id.* at 1730–31. The Court declared that "[a]s long as the state as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied." *Id.* at 1731.

The Pennsylvania regulatory scheme governing hospitals, which must be complied with in order to obtain a license from the Department of Health, requires all health facilities to have an organized medical staff responsible for the quality of all medical care provided within. 28 Pa.Admin.Code §§ 101.51, 107.1 (Shepard's 1983). Each health care facility must have either a governing body or an owner who shall assume full legal authority and responsibility for the conduct of the hospital. *Id.* at § 103.1. The medical staff is accountable to the governing body of the hospital. *Id.* at §§ 101.51, 107.1. The governing body must utilize the advice of the medical staff in granting and defining the scope of clinical privileges. *Id.* at § 103.4(6). When the governing body does not concur with the medical staff's recommendation, the regulations provide that the governing body's recommendation should be reviewed by a joint committee of the medical staff and the governing body before a final decision is made by the governing body. *Id.* The governing body may also delegate to the medical staff the authority to evaluate the professional competence of staff members and applicants for staff privileges and to make recommendations and reappointments. *Id.* at § 103.4(9). The governing

body must require the medical staff to establish procedures which ensure the achievement and maintenance of high standards of ethical and professional practices. *Id.* at § 103.4(12).

Medical staffs must define the requirements for admission to staff membership and for the delineation and retention of staff privileges. 28 Pa.Admin.Code § 107.-2. No applicant may be denied medical staff privileges on the basis of any criterion lacking professional or ethical justification. *Id.* at § 107.3. Pennsylvania also requires medical staffs to develop and adopt bylaws, which must specify procedures for admission, retention, assignment and reduction or withdrawal of privileges. *Id.* at §§ 107.11–12. All health facilities must establish a credentials committee, which makes recommendations for staff appointments, reappointments, promotions, demotions and clinical privileges. *Id.* at § 107.26(b)(1). The administrative code also permits agents of the Department of Health to have access to all facilities, records, documents, including those relating to the governance and management of health care facilities. *Id.* at § 101.67(a)(2).

The Pennsylvania administrative regulations governing health care facilities do not expressly permit anticompetitive conduct by a hospital and its medical staffs. An examination of the regulatory scheme does not reveal an intention to replace competition in the market for hospital medical staff positions among physicians with a regulatory structure. The regulations provide that the denial of medical staff privileges may only be based on professional or ethical grounds, which could be viewed as procompetitive, since it prohibits denials made for purely anticompetitive reasons. Most decisions which are made in any competitive job market are based on professional or ethical grounds. Allowing medical staffs to make hospital staffing decisions based on professional or ethical grounds is not tantamount to an approval of anticompetitive conduct. That some medical staffs may be able to engage in anticompetitive conduct while in compliance with the Pennsylvania regulatory scheme does not necessarily demonstrate that the legislature intended to permit such conduct.

In contrast to the Pennsylvania regulations, the statutes in *Southern Motor Carriers* explicitly provided that intrastate common carrier rates be determined by a regulatory agency rather than the market. 105 S.Ct. at 1730–31. The California statutory scheme in *Midcal* expressly required that all wine be sold according to predetermined price schedules. 445 U.S. at 105, 100 S.Ct. at 943. Nothing in the Pennsylvania regulations indicates an intent to permit hospitals and/or their medical staffs to engage in anticompetitive conduct or demonstrates that the logical result of the activities authorized by the regulations would be to inhibit competition. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 1718, 85 L.Ed.2d 24 (1985). *Cf. Goldfarb v. Virginia State Bar*, 421 U.S. 773, 789–90, 95 S.Ct. 2004, 2014–15, 44 L.Ed.2d 572 (1975) (state did not indicate intention to do away with competition among lawyers merely because it authorized its highest court to regulate the practice of law). Because I have determined that the Pennsylvania regulatory scheme does not expressly permit anticompetitive conduct, I hold that it does not satisfy the first prong of the *Midcal* test.

Defendants contend that the Seventh Circuit's decision in *Marrese v. Interqual, Inc.*, 748 F.2d 373 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985), compels a different result. Marrese, a surgeon, brought an antitrust action against a hospital and its executive committee after his clinical privileges at the hospital were revoked. The court of appeals upheld the district court's dismissal of the complaint, holding that defendants were immune from antitrust liability pursuant to the *Parker* "state action" doctrine. 748 F.2d at 395.

Applying the *Midcal* standard, the court of appeals first examined Indiana's statutory scheme governing hospitals. *Id.* at 387–88. Indiana required all hospitals to

establish peer review committees to ensure quality health care. *Id.* at 387. To achieve this goal, the peer review committees were required to review and evaluate the qualifications and performance of medical staff members. *Id.* at 388. The court of appeals reasoned that because "a necessary and reasonable consequence of this state mandated medical peer process" was that members of the hospital medical staff must review the performance of competing staff members and recommend the revocation of staff privileges in some situations, the first prong of the *Midcal* test had been satisfied. *Id.* at 388–89.

I do not find the reasoning of the court of appeals in *Marrese* persuasive. *See Quinn v. Kent General Hospital, Inc.*, 617 F.Supp. 1226 (D.Del.1985) (district court rejected *Marrese* analysis and held that state action immunity did not apply). The *Marrese* court never actually applied the *Midcal* standard, since it never determined whether Indiana clearly expressed an intent to permit anticompetitive conduct. *See Marrese,* 748 F.2d at 387 ("our initial inquiry is whether the defendants' review of Dr. Marrese's surgical 'back' procedures at Deaconess and the recommendation that his clinical privileges be revoked is conduct 'clearly articulated and affirmatively expressed as state policy.'").

■■■ In support of its determination that *Parker* immunity applied, the *Marrese* court considered the effect that a denial of antitrust immunity would have on the willingness of physicians to participate in peer review activities, and noted that the Illinois statutory scheme provided members of peer review committees with absolute immunity from civil liability for actions taken in good faith. 748 F.2d at 391–93. The court of appeals reasoned that this grant of statutory immunity furthered the underlying purpose of the Sherman Act (the protection of consumer welfare) by assuring the competency and quality of hospital medical staffs. 748 F.2d at 392. The court also noted that the plaintiff had been provided with a wide range of procedural safeguards. 748 F.2d at 393. These factors

were not considered by the court in its application of the first prong of the *Midcal* test, however, and are not pertinent to the issue of whether the *Parker* doctrine applies to the defendants in the instant case. A later case decided in the Seventh Circuit determined that a statutory grant of good faith immunity from civil liability to peer review committee members was sufficient to meet the first prong of the *Midcal* test. *Tambone v. Memorial Hospital,* 635 F.Supp. 508, 513 (N.D.Ill.1986). The *Tambone* court, while conceding that it was bound by the *Marrese* decision, reasoned that the peer review immunity statute was proof that the legislature intended to affect competition in the marketplace. 635 F.Supp. at 513 n. 2. The Pennsylvania Peer Review Protection Act provides members of hospital peer review committees with qualified immunity from civil liability. 63 P.S. § 425.3(b)(1). The Act does not, however, demonstrate that the Pennsylvania legislature intended to permit anticompetitive activity as a necessary consequence of the regulatory scheme which it designed for health care facilities. *See Quinn v. Kent General Hospital, Inc.*, 617 F.Supp. at 1239 n. 10 (court stated that whether the antitrust exemption would frustrate the policy of the peer review statute was irrelevant, "since the relevant inquiry is. not whether the exemption would foster the purpose of the statute but whether the restriction of competition is a necessary consequence of engaging in the activity promoted by the statute.").

Since I have determined that the Pennsylvania regulatory scheme does not meet the requirements of the first prong of the *Midcal* test, I need not determine whether the second prong has been satisfied, and conclude that defendants' conduct is not immune from antitrust liability under the *Parker* "state action" doctrine.

### ORDER

This 9th day of September, 1986, it is ORDERED that

1. Defendants' Motion for Summary Judgment is GRANTED on plaintiff's

breach of contract claims concerning defendants' refusal to allow him an associate on the Lankenau Medical Staff and defendants' alleged failure to provide plaintiff with a hearing on the denial of his reappointment, and on plaintiff's tortious interference claims concerning plaintiff's existing contracts with Lankenau Hospital, the Lankenau Medical Staff, plaintiff's patients, and Dr. Robert Promisloff.

2. Defendants' Motion for Summary Judgment is DENIED on plaintiff's breach of contract claims concerning the denial of his reappointment to the Lankenau Medical Staff and plaintiff's tortious interference claims concerning plaintiff's prospective contractual relations with his patients, various hospitals in the Virgin Islands, potential medical partners, Drs. Promisloff and Lenchner, and Haverford Hospital.

3. Defendants' Motion for Summary Judgment is DENIED on defendants' claim that their conduct is immune from federal antitrust liability pursuant to the *Parker* doctrine.